**CHARLES FENTON, Plaintiff**

**v.**

**C&C CONSTRUCTION AND MAINTENANCE, INC. and
HOVENSA L.L.C. (Formerly HOVIC), Defendant**

SX-96-CV-791

Superior Court of the Virgin Islands

Division of St. Croix

April 4, 2007

LEE J. ROHN, ESQ., Law Offices of Rohn and Cameron, St. Croix, VI, *Attorney for Plaintiff*.

BETH MOSS, ESQ., Bryant, Barnes, Moss & Beckstedt, LLP, St. Croix, VI, *Attorney for Defendant Honvesa [sic] LLC*.

CHARLES E. ENGEMAN, ESQ., Ogletree, Deakins, Nash, Smock & Stewart, LLC, St. Thomas, VI, *Attorney for Defendant C&C Construction & Maintenance, Inc.*

D'ERAMO, *Judge*

## MEMORANDUM OPINION AND ORDER

(April 4, 2007)

THIS MATTER is before the Court on Defendant C&C Construction's Motion for Summary Judgment filed January 25, 1999,

and Defendant HOVENSA's Motion to Dismiss on the Issue of Successor Liability and in the Alternative for Summary Judgment filed September 6, 2002. On January 31, 2007, the Court heard oral arguments from all parties on these motions. For the reasons set forth herein, the Court grants both motions for summary judgment.

## Facts

This case arises from Plaintiff Charles Fenton's termination from employment with Defendant C&C Construction and Maintenance, Inc. ("C&C") in 1996. Fenton's First Amended Complaint claims wrongful discharge under the Virgin Islands Wrongful Discharge Act, 24 V.I.C. § 76, breach of contract, and intentional and negligent infliction of emotional distress. Fenton is seeking both compensatory and punitive damages. Fenton has named HOVENSA, L.L.C. ("HOVENSA") as a Defendant on the theory that HOVENSA controlled the employment decisions of C&C. At oral argument, Plaintiff's counsel conceded that HOVENSA's liability, to the extent that it exists, is derivative of C&C's.

Fenton was employed by C&C as a carpenter for approximately four and one-half (4 1/2) years, from March 1992 through November 1996, at which time he was discharged. C&C's stated reason for the discharge is excessive absenteeism.

It is uncontested that Fenton was granted vacation leave from July 12, 1996, through August 2, 1996. Tamara Rogers of C&C's personnel department testified that Fenton did not return to work on August 2, 1996, and did not have contact with the personnel office at C&C until approximately the end of August, 1996.[1] At that time, Fenton advised

---

[1] Q: Do you know when in August '96 you took over?
 A: I don't have the exact date with me.
 Q: Do you know approximately, beginning, middle, end?
 A: I would say ending.

 ...

 Q: Okay, so when you pulled up from the HOVIC Chrone system that Mr. Fenton was out, what did you do?
 A: Go to the file to see whether or not there's a leave of absence form in there.
 Q: And what did you discover?
 A: Discovered that his leave of absence for vacation was—it was out and there was no documentation for the time specified. Vacation was up and nothing else beyond that.

Rogers Dep. 21:9-22:22 Sept. 15, 1998.

Ms. Rogers that he needed additional medical leave.[2] Per her instruction, he faxed a written request for additional leave on September 4, 1996.[3] Ms. Rogers, on behalf of C&C, granted his request for more time and he was scheduled to return to work on September 15, 1996.[4] It is unclear whether Ms. Rogers consulted with a supervisor prior to granting this request.[5] It is also unclear as to who she may have informed that she had

---

[2] Q: How did you find a phone number for him?

A: Mr. Fenton called and said at that time that he needed more time. Actually, he called—he left a message and then I called him back long distance on the number that he left in the office.

Q: How long was it between when he called and left a message when you called him back?

A: I want to believe I called him the same day.

...

Q: Okay. And when you called him back what did Mr. Fenton tell you?

A: In so many words—I can't quote, but in so many words that he was out sick, he needed more time.

...

Q: Okay. Do you recall how much time he told you he thought he might need?

A: We didn't go into that detail. I requested him to send me documents.

Q: What documents did you request that he send?

A: I requested him to send me some medical excuse forms.

*Rogers Dep.* 23:15-24:18.

[3] Q: How long after the conversation with him did he send you a medical excuse form?

A: I remember the fax stated September 4th. That's when it was faxed.

*Rogers Dep.* 25:24-26:2.

[4] Q: Okay. And when you got the form, what was—was there a decision made as to his status?

A: Yes. Give additional time.

Q: And how much additional time did you give him?

A: To the 15th.

Q: Of what?

A: September.

*Rogers Dep.* 27:9-15.

[5] Q: Okay. Did you show [the medical excuse form] to anyone?

A: I may have showed it to Gus James.

...

Q: Who did you speak to, anybody? To say do I have permission to agree or did you just agree on your own?

A: I believe I agreed at that time, yes.

Q: On your own?

granted this request.[6] It is uncontested that Fenton did not return to work on September 15, 1996.

Ms. Rogers and Fenton finally spoke again on October 25, 1996, at which time he requested additional medical leave.[7] On October 29, Fenton faxed Ms. Rogers a form saying he needed additional time off.[8] On this occasion, Ms. Rogers consulted with Gus James, a supervisor at C&C, and they decided to grant the additional leave.[9] Fenton was

---

A: Yes, I believe at that time.

*Rogers Dep.* 27:9-28:14.

[6] Q: Okay. After you told him that, did you tell anybody that you had told him that he had until the 15th?

A: After that time period I believe I talked with his supervisor which is a normal practice to let him know what's going on, his employee is going to be out for that time period.

Q: And would—who would that have been?

A: More likely Chuck Baxter.

Q: Did you check with Mr. Hurtault about it?

A: Whoever. Usually what happens, if one person is going on vacation, whoever is in charge of the department at that time I would have discussed it with them.

*Rogers Dep.* 28:23-29:9.

[7] Q: Had you had any conversations with Mr. Fenton in between then?

A: Yes. I talked to him again—first I placed a call to him on October 25th to finding out what's going on and that's when he send me —

Q: And where did you call him on October 24th? [sic]

A: According to the phone conversation, Bronx, New York.

Q: And what was the source of that conversation?

A: To find out what's going on.

Q: And what did he tell you?

A: That he needed more time.

*Rogers Dep.* 31:5-16.

[8] Q: Okay. And when is the next conversation you had with anybody about Mr. Fenton?

A: Let's see. After September 15th, Mr. Fenton sent another document, another form questioning more time off.

Q: Okay. And when was that?

...

A: I received that form on—it was faxed October 29th.

*Rogers Dep.* 30:19-31:4.

[9] Q: Did you tell him he can have more time?

A: I talked to him on the 24th. I talked to him the 29th. The doctor stated 14 days from the 15th day of October.

scheduled to return to work approximately two weeks later, either on November 11 or, at latest, November 16, 1996.[10] On November 19, 1996, Fenton had still not reported to work. Ms. Rogers elected to terminate Fenton on that date, and her deposition testimony indicates she spoke with the supervisor and general manager prior to making that decision.[11]

Q: Did you speak to anyone before you told him he could have the additional days?

A: I discussed the situation what I knew with Gus James.

Q: And what was the substance that you discussed with him?

A: Concerning the time period that he was out.

Q: What did you say as best you can recall and what did he say as best you can recall?

A: We took a look at the situation, the fact that he was out on leave. The fact that he's been working for us for a period of time, so that into consideration and at that time we granted him the additional time.

Q: Did you have to get permission from anyone to grant?

A: Usually consult with the general manager.

Q: Did you have to get permission from anyone to grant any additional time?

A: I don't consider it to be a have to. I did it so we, you know, I usually try to make sure that everybody is aware of what's going on.

Q: Could you have given him the additional time on your own?

A: Yes.

Q: Okay. Did Mr. James agree to give him the additional time?

A: Yes.

*Rogers Dep.* 32:7-33:12.

[10] Q: Okay, and what did you tell Mr. Fenton?

A: Get the 15 days from the 28th. *Rogers Dep.* 33:15-16.

Q: When did you have down that he was due to come back?

A: His scheduled time to come back would have been the second week of November.

Q: What date, ma'am?

A: Fifteen days from October 28th would be—would be November the 11th.

Q: Okay. Well, have you received—didn't you write a note that said you didn't expect him back until November 16th?

...

A: I looked at the documents in two different matters. The note stated 15 days from October 28th. I looked at it in two manners: One, not counting weekends, and one—and second one counting weekends.

*Rogers Dep.* 35:9-36:20.

[11] Q: Now, when you decided to terminate him on the 19th, did you discuss that decision with anyone?

A: Yes.

Q: Who did you discuss that with?

268

## Count I: Wrongful Discharge

Count I of Fenton's First Amended Complaint alleges that he was terminated in violation of the Virgin Islands Wrongful Discharge Act, ("WDA") which is found at 24 V.I.C. § 76 *et seq.* Section 76 provides:

(a) Unless modified by union contract, an employer may dismiss any employee:

(1) who engages in a business which conflicts with his duties to his employer or renders him a rival of his employer;

(2) whose insolent or offensive conduct toward a customer of the employer injures the employer's business;

(3) whose use of intoxicants or controlled substances interferes with the proper discharge of his duties;

(4) who willfully and intentionally disobeys reasonable and lawful rules, orders, and instructions of the employer; provided, however, the employer shall not bar an employee from patronizing the employer's business after the employee's working hours are completed;

(5) who performs his work assignments in a negligent manner;

(6) whose continuous absences from his place of employment affect the interests of his employer;

---

A: General manager.

Q: Is that the same discussion that we were just talking about or is that a second discussion?

A: Well, we previously talked a few minutes ago about a conversation prior to terminating him and that is the same conversation.

Q: Okay. Besides the general manager did you discuss it with anyone else?

A: During the interim I talked with Supervisor Chuck Baxter.

Q: And what was the substance of that conversation?

A: Well, he was inquiring from time to time about Mr. Fenton, about him not being at work.

Q: Um-hum. And did he ask you to terminate him?

A: I don't recall him saying to me to terminate him.

Q: Did you ever tell Mr. Baxter you were going to terminate [Mr. Fenton]?

A: He was aware that he was going to be released.

...

Q: What did you tell him?

A: That we were going to release Mr. Fenton.

*Rogers Dep.* 41:7-42:18.

(7) who is incompetent or inefficient, thereby impairing his usefulness to his employer;

(8) who is dishonest; or

(9) whose conduct is such that it leads to the refusal, reluctance or inability of other employees to work with him.

(b) The Commissioner may by rule or regulation adopt additional grounds for discharge of an employee not inconsistent with the provisions enumerated in subsection (a) of this section.

(c) Any employee discharged for reasons other than those stated in subsection (a) of this section shall be considered to have been wrongfully discharged; however, nothing in this section shall be construed as prohibiting an employer from terminating an employee as a result of the cessation of business operations or as a result of a general cutback in the work force due to economic hardship, or as a result of the employee's participation in concerted activity that is not protected by this title.

In ruling upon the pending motions, the Court adopts the analysis used by the District Court for Wrongful Discharge claims in *Rajbahadoorsingh v. Chase Manhattan Bank*, 168 F. Supp. 2d 496 (D.V.I. 2001). The District Court in *Rajbahadoorsingh* allocated the burden of proof by the same method used in Federal discrimination claims brought under Title VII (42 U.S.C. §§ 2000e *et seq.*), 42 U.S.C. § 1982, and the Age Discrimination in Employment Act (29 U.S.C. § 623):

> First, the plaintiff must carry the initial burden under the statute establishing a prima facie case of [unlawful] discrimination. To accomplish this, the plaintiff must show that: (1) he is part of a protected class; (2) he was qualified for his position; (3) despite these qualifications, he was terminated; and (4) he was replaced by a member of a non-protected class or someone in a non-protected class, otherwise similarly situated, was treated more favorably. Under this first prong, establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.
>
> Once the plaintiff establishes this presumption, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Under this

second prong, the employer has the burden of producing rebuttal evidence. The employer can satisfy this burden by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. This second prong does not require the employer to prove that it was actually motivated by the proffered reasons. It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. Even though the burden of production shifts to the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Finally, after the defendant has offered a legitimate, nondiscriminatory reason for its actions, the burden of production under the third and final prong shifts back to the plaintiff to show, by a preponderance of the evidence, that the proffered reason is pretextual. To satisfy this burden, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Rajbahadoorsingh* at 501, citations omitted.

Judge Moore, in setting forth his reasons for adopting this method of allocating burdens of proof, pointed out similarities between causes of action under Title VII and the WDA. For example, he quoted the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a Title VII case:

There are societal as well as personal interests on both sides of this equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions, *id.* at 800-1.

Judge Moore then went on to identify two public policies which he considered in reaching his decision:

> Although a plaintiff's inability to provide evidence to rebut a defendant's proffered statutorily-approved reason for the termination will result in the loss of a presumption of a wrongful discharge and thus place a burden on the Plaintiff to prevail, it stems from the inherent tension between the goal of preventing wrongful firings and our society's commitment to free decision making by the private sector in economic affairs. The burden is thus the same for both WDA and Title VII claimants. *Rajbahadoorsingh*, 168 F. Supp. 2d at 501.

This Court believes that the shifting burdens adopted by *Rajbahadoorsingh* strike the correct balance between these two policy considerations. As with Title VII cases, the *Rajbahadoorsingh* shifting burdens prevent the Court and/or the jury from being required to undertake plenary reviews of individual employment decisions. It is important to note in this regard that the decision of the finder of fact at trial comes at the end of a long process of discovery and motion practice undertaken by compensated professionals. In the case before the Court, attorneys from three of the most respected firms in the Virgin Islands have been litigating this matter for more than ten years. The Court is designed to accommodate this process, and the issues before it are honed by years of effort on the part of opposing attorneys. An employer such as C&C is not designed to accommodate this process; indeed, it would be economically catastrophic to require an employer to devote resources to each employment decision equal to the resources devoted to full-blown litigation. Thus, it would be unfair in the extreme to substitute a finder of fact's judgment for an employer's, and to hold an employer to the same standard as one would hold a finder of fact deciding after years of litigation.

The Supreme Court of California recognized these realities in *Cotran v. Rollins*, 17 Cal. 4th 93, 69 Cal. Rptr. 2d 900, 948 P.2d 412 (1998). In that case, the Court stated:

> The proper inquiry for the jury, in other words, is not, "Did the employee in fact commit the act leading to dismissal?" It is "Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that that [sic] are not arbitrary or pretextual?" The jury conducts a factual inquiry in both cases, but

the questions are not the same. In the first, the jury decides the ultimate truth of the employee's alleged misconduct. In the second, it focuses on the employer's response to allegations of misconduct. *Cotran*, 948 P.2d at 421-422.

██ In the instant case, it is undisputed that Fenton was absent from work from July 12, 1996, to November 19, 1996. During that time he was in sporadic contact with his employer. He requested leave in advance for some of the days that he missed, and requested retroactive leave on others. It is undisputed that the latest date for which he requested leave was November 16, 1996, and that he had not reported to work by November 19, 1996, at which time he was terminated. Under the *Rajbahadoorsingh* standard, Fenton must introduce evidence of the following to make a prima facie case with respect to his Wrongful Discharge claim:

(1) He was an employee;
(2) Of a covered employer;
(3) He was discharged; and
(4) The discharge was wrongful.

██ The first three elements are undisputed, but there is no evidence whatsoever to suggest the existence of the fourth. Fenton has not provided evidence of any reason for his termination other than that given by his employer, absenteeism.[12] While the plaintiff is not obligated to articulate a reason for which the employer's proffered reason is a pretext, the plaintiff must demonstrate weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action, and Fenton has failed to do this in the instant case. Thus, summary judgment will be granted as to Count I of the First Amended Complaint.

### Count II: Breach of Contract

Count II of Fenton's Complaint alleges that he was terminated in breach of contractual rights that he claims arose pursuant to C&C's

---

[12] At oral argument, in response to a direct question by the Court, Fenton's counsel suggested that Mr. Fenton's termination was as a result of something intrinsic to his illness, rather than that his illness made him miss work. The suggestion was vague and is unsupported by evidence of record.

Employee Handbook. Fenton points to the section of the Employee Handbook stating that an employee is subject to progressive discipline for absenteeism as follows:

> ... Repeated absenteeism and/or tardiness will be cause for disciplinary action up to an including termination.

| Absenteeism | Personnel Action |
| --- | --- |
| Within one month's time | |
| 1 Absences without notification | Warning letter |
| 2 Absences without notification | 4 day suspension |
| 3 Absences without notification | Termination |

C&C responds by alleging that its handbook does not create contractual rights in its employees. It is well settled that internal personnel rules can be construed as an implied contract, if there is evidence that the employer intended to be bound by the requirements set forth in those rules, *Smith v. VIPA*, 2005 US Dist LEXIS 56, 46 V.I. 466 (D.V.I 2005). The Court need not decide whether a contract was created under the specific facts of this case, however, because the Court believes it abundantly clear that, even if so, C&C substantially complied with the procedures in its handbook.

██ It is important to note that C&C appears to have gone out of its way to accommodate Fenton. The record is undisputed that Fenton was absent without notification for most of the month of August 1996, half of September, most of October, and an additional three (3) to eight (8) days in November just before his termination. While C&C may have approved leave for Fenton retroactively, it does not mean that his failure to ask for leave in advance on those occasions could not be considered by C&C in its ultimate decision to terminate him when he failed to report to work on an agreed-upon date, again without notice. The lengths to which C&C went to accommodate Fenton go far beyond any level of procedural protection he would have received from strict compliance with the handbook. The Court holds that the repeated retroactive approval of absences without notification functions in lieu of the notices set forth in the handbook, and therefore C&C has substantially complied therewith. Thus the Court will grant summary judgment as to Count II.

## Count III: Intentional Infliction of Emotional Distress

Fenton has alleged that his termination supports a cause of action for Intentional Infliction of Emotional Distress. In *Alvarez v. Pueblo International, Inc.*, 24 V.I. 141 (T.C. 1989), this Court dismissed a similar claim, stating:

> While there may be disagreement with the decision to fire the plaintiff, the defendant's exercise of its discretion in discharging Alvarez does not rise to the level of conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

> In addition, although the absence of any physical injury is not fatal to a claim for emotional distress, if the plaintiff has not suffered physical injury as a result of the defendant's conduct, the conduct must have been sufficiently extreme and outrageous to ensure the genuineness of the claim.

> Particularly since Alvarez worked at Pueblo since his youth and was suddenly fired, his reactions are understandable. The plaintiffs' abnormally elevated blood pressure and blood sugar, the frequent headaches experienced by Mr. Alvarez, debt arrearages and need for medication are also not surprising. Nevertheless, these disturbances may be said to typify the experience of persons "who find themselves suddenly unemployed." Neither the defendant's conduct in discharging Alvarez nor the plaintiffs' reaction to that experience establish the elements of a claim for intentional infliction of emotional distress, *id.* at 147, citations omitted.

Employing the standard articulated in *Alvarez*, C&C's conduct was not, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Accordingly, this Court will grant summary judgment to Defendants on Fenton's claim for Intentional Infliction of Emotional Distress.

275

## Count IV: Negligent Infliction of Emotional Distress

Two elements are required to sustain a claim of negligent infliction of emotional distress. First, the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress. *Int'l Islamic Cmty. of Masjid Baytulkhaliq, Inc. v. U.S.*, 981 F. Supp. 352, 37 V.I. 287, 315 (D.V.I. 1997), *aff'd*, 176 F.3d 472 (3d Cir. 1999) *Mingolla v. Minnesota Mining and Mfg. Co.*, 893 F. Supp. 499, 506 (D.V.I. 1995). *See also Lempert v. Singer*, 766 F. Supp. 1356, 26 V.I. 326 (D.V.I. 1995) (there can be no liability for negligent infliction of emotional distress absent any physical harm). In the instant case, the underlying conduct, plaintiff's termination, has not be shown to have been tortious, and there is no allegation that he was placed in physical danger thereby. Thus, summary judgment will be granted to C&C with respect to Count IV.

## Count V: ADA and Public Policy

In Paragraph 50 of Count V of the First Amended Complaint, Fenton alleges that, "The actions of defendants violated the ADA and public policy." Fenton thus harkens back to the cause of action for discharge in violation of public policy first enunciated in the Virgin Islands in the case of *Avandale Robinson v. Hess Oil Virgin Islands Corp.*, 19 V.I. 106 (D.V.I. 1982). There is some question about whether this cause of action survived the passage of the WDA.[13] However, in the instant case, Fenton has failed to introduce evidence precluding the entry of summary judgment on such a cause of action.

The Americans with Disabilities Act, Title 42 U.S.C. § 12101 *et seq.,* contains an enforcement procedure which requires, among other things, an administrative filing, *see* 42 U.S.C. § 12117. Count V in the instant case does not allege a cause of action under the ADA, but rather points to the ADA as a source of the public policy that Fenton alleges his discharge violated. Where a statute is enacted to provide a remedy for a specific type of wrong, and where that statute contains a specific enforcement mechanism, a litigant must look to the statute for their

---

[13] See discussion in *Bell v. Chase Manhattan Bank*, 40 F. Supp. 2d 307, 40 V.I. 377, 379 at Footnote 2 (D.V.I. 1999), *overruled on other grounds*, *St. Thomas-St. John Hotel & Tourism v. Government of the Virgin Islands*, 218 F.3d 232 (3d Cir. 2000).

remedy, instead of performing an "end around" to the procedural requirements of the statute. *See Winney v. Ransom & Hastings, Inc.*, 149 Vt. 213, 542 A.2d 269 (1988) ("Where a statute confers a remedy unknown to common law, and prescribes the mode of enforcing it, that mode alone can be resorted to."). *See also Bonham v. Dresser Indus., Inc.*, 569 F.2d 187 (C.A. Pa. 1977) (holding that passage of Pennsylvania's Human Relations Act did not create a separate common law claim where none existed before, and the Human Relations Act would provide the exclusive state remedy for age discrimination claims). *See also Violette v. Int'l Bus. Machines Corp.*, 962 F. Supp. 446 (D.Vt. 1996) ("[B]ecause discrimination claims are unknown at common law and are solely statutory creations, Plaintiff's claim is preempted by the [Americans with Disabilities Act and the Fair Employment Practices Act]."). Accordingly, Plaintiff's claim of disability discrimination is preempted by the ADA, and the Court will grant summary judgment in favor of C&C on Count V.

Accordingly, it is hereby:

ORDERED that Summary Judgment is GRANTED to Defendants on all counts of the First Amended Complaint, and the instant case is DISMISSED WITH PREJUDICE.

DONE and so ORDERED this 4 day of April, 2007.