**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3735

_____

STEPHEN MCCAULEY,

Appellant

v.

UNIVERSITY OF THE VIRGIN ISLANDS; SEAN
GEORGES, in His Individual and Official Capacities;
LAVERNE RAGSTER, DR.

_____

On Appeal from District Court
of the Virgin Islands
District Court No. 3-05-cv-00188
District Judge: The Honorable Curtis V. Gomez

_____

Argued May 3, 2010

Before: SMITH, CHAGARES, and JORDAN, *Circuit Judges*

(Filed: August 18, 2010 )

Samuel H. Hall, Jr.
Marie E. Thomas Griffith (argued)
Hall & Griffith
No. 91B Solberg
P.O. Box 305587
Charlotte Amalie, St. Thomas, USVI 00803
        *Counsel for Appellee*

Darren John-Baptiste (argued)
The Practice
The Professional Building #1
Fortets Gade Suite B4
St. Thomas, USVI 00802
        *Counsel for Appellant*

L. Theodore Hoppe, Jr.
Hoppe & Martin
423 McFarland Road
Suite 100
Kennett Square, PA 19311
        *Counsel for Amicus Appellant*

---

OPINION

---

SMITH, *Circuit Judge.*

The University of the Virgin Islands ("UVI") charged Stephen McCauley, a UVI student, with violating provisions of its Student Code of Conduct (the "Code") for his alleged harassment of an individual who had accused his friend of rape. In response, McCauley filed a 42 U.S.C. § 1983 suit against UVI; its president, Dr. LaVerne Ragster; and its housing director, Sean Georges, alleging that various Code provisions violated the First Amendment. After a bench trial, the District Court dismissed all claims against UVI because it was not a "person" for purposes of § 1983, determined that Ragster and Georges were acting in their official capacities as UVI employees and were not "persons" for purposes of § 1983, ruled that one Code provision, Major Infraction Paragraph E, was facially overbroad in violation of the First Amendment, and enjoined Ragster and Georges from enforcing the offending paragraph.

McCauley now appeals the District Court's (1) conclusion that UVI, Ragster, and Georges are not "persons" for purposes of § 1983, (2) conclusion that certain Code provisions do not violate the First Amendment, and (3) failure to address his as-applied challenge to Major Infraction Paragraph E, the Code provision UVI charged him with violating.[1]

---

[1] The District Court had subject matter jurisdiction under 48 U.S.C. § 1612(a) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

3

After reviewing the record, we agree with the District Court on the first and third issues. UVI is an arm of the Territory of the Virgin Islands and, therefore, not a "person" for purposes of § 1983. Ragster and Georges, as employees of UVI acting in their official capacities, were likewise not "persons" for purposes of § 1983. Adjudication of McCauley's as-applied challenge to Major Infraction Paragraph E was unnecessary because the District Court had already concluded that the paragraph was facially unconstitutional. The District Court went astray, however, in its adjudication of McCauley's other challenges to the Code. Setting aside Major Infraction Paragraph E, two of the four remaining challenged provisions were unconstitutional infringements on students' First Amendment right to free speech. Based on these conclusions we will affirm the District Court in part and reverse in part.

I.

At all times relevant to this appeal, McCauley was a student at UVI, Ragster was the president of UVI, and Georges was the housing director of UVI. During McCauley's time at UVI, the Code governed, *inter alia*, student speech.

On September 30, 2005, McCauley and other UVI students went to a local beach. Two students who were with McCauley, Josh Carlson and Jenna Piasecki, broke off from the group and a sexual act occurred between them. The next day, Carlson was charged with raping Piasecki. After learning of

4

that charge, McCauley visited Piasecki's dorm room to talk to her about the alleged rape. Piasecki complained to UVI officials after the visit that McCauley harassed her.

Later that month, UVI officials twice warned McCauley to avoid contact with Piasecki. Georges told McCauley that Piasecki had complained of harassment and that he should stay away from her to avoid repercussions under the Code. McCauley was later approached by other UVI officials and was warned to avoid all contact with Piasecki. On or about November 7, 2005, UVI charged McCauley with violating Major Infraction Paragraph E of the Code and began disciplinary proceedings against him.[2] Major Infraction Paragraph E prohibits:

> Committing, conspiring to commit, or causing to be committed any act which causes or is likely to cause serious physical or mental harm or which tends to injure or actually injures, frightens, demeans, degrades or disgraces any person. This includes but is not limited to violation of the University policies on hazing, sexual harassment or sexual assault.

---

[2] The Code distinguished between major, general, and minor infractions. The maximum sanction for each was expulsion, suspension, and disciplinary probation, respectively.

5

McCauley pled not guilty to the charge.

Shortly after receiving notice of the charge against him, McCauley filed a § 1983 suit against UVI, Georges, Ragster, and other unidentified defendants for violating his First Amendment rights to free speech and freedom of association. McCauley challenged, *inter alia*, the constitutionality of Major Infraction Paragraphs C ("Paragraph C"), E ("Paragraph E"), and R ("Paragraph R"), General Infraction Paragraph B ("Paragraph B"), and Minor Infraction Paragraph H ("Paragraph H"). He alleged that all the paragraphs were facially unconstitutional and that Paragraph E was unconstitutional as applied to him.

After McCauley received notice of the charge against him, he was criminally charged with witness tampering, and UVI agreed to postpone its disciplinary hearing against him until the criminal charges were resolved. On March 31, 2009, after the criminal charges were resolved, UVI sent McCauley a second notice of charges, which listed the same charges from the November 2005 notice and added violations of UVI's drug and alcohol policy. The second notice stated that the Paragraph E charge was based on (1) McCauley's visit to Piasecki's dorm room on the day Carlson was charged with rape; (2) an allegedly harassing phone call McCauley made to Piasecki on October 18, 2005; and (3) McCauley's alleged harassment of Piasecki at an off-campus bar on October 20, 2005.

6

On April 28, 2009, McCauley was found guilty of violating Paragraph E and another paragraph not at issue in this appeal. As punishment, he was ordered to write a letter of apology to Piasecki and pay a $200 fine.

The next month, a non-jury trial was conducted on McCauley's § 1983 action. On August 21, 2009, the District Court: dismissed all claims against UVI because it was not a "person" under § 1983, entered judgment in favor of McCauley on his facial challenge to Paragraph E, enjoined Ragster, as president of UVI, and Georges, as housing director of UVI, from enforcing Paragraph E, and entered judgment in favor of the defendants on McCauley's other claims. McCauley filed a notice of appeal on September 18, 2009.

II.

McCauley asserted facial challenges against Paragraphs B, C, E, H, and R. At trial, he conceded that he had suffered no deprivations from Paragraphs B, C, H, and R. For example, during cross-examination McCauley was asked, "[H]ave you suffered a deprivation in any way in connection with [Paragraph] R?" He replied, "no." McCauley made similar concessions for the other paragraphs.[3]

---

[3] For Paragraph B, McCauley admitted that he did not wish to express himself "in an obscene, lewd, [or] indecent manner[.]" He also conceded that he did not want to "verbally

These concessions raise concerns about McCauley's standing to assert the claims alleged in his complaint. Because "we are required to raise issues of standing *sua sponte* if such issues exist," *Addiction Specialists, Inc v. Twp. of Hampton*, 411 F.3d 399, 405 (3d Cir. 2005) (internal quotation marks omitted), before considering the merits of this appeal, we first consider whether McCauley has standing.[4]

Our inquiry into Paragraph E is promptly resolved. McCauley obviously has standing to challenge Paragraph E, as UVI charged him with violating that paragraph. The other paragraphs, however, require closer examination. Litigants asserting facial challenges involving overbreadth under the First Amendment have standing where "their own rights of free expression are [not] violated" because "of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601,

---

assault others on [UVI] property." When McCauley was asked whether he had "suffered a deprivation of any kind" due to Paragraph H, he replied "no." McCauley similarly conceded that he had not suffered any deprivation in connection with Paragraph C.

[4] "We exercise plenary review of standing issues, but review the factual elements underlying the District Court's determination of standing on a clear error standard." *Goode v. City of Philadelphia*, 539 F.3d 311, 316 (3d Cir. 2008).

612 (1973); *Pitt News v. Fisher*, 215 F.3d 354, 363 (3d Cir. 2000) ("[W]hen a plaintiff attempts to challenge a statute as being an overbroad restriction on First Amendment rights, the requirement that an impediment exist to the third party asserting his or her own rights should be relaxed[.]") (citing *Sec'y of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984)); *Amato v. Wilentz*, 952 F.2d 742, 753 (3d Cir. 1991) ("The Supreme Court rather freely grants standing to raise overbreadth claims, on the ground that an overbroad . . . regulation may chill the expression of others not before the court.").[5]

Despite McCauley's trial testimony that he suffered no deprivations from Paragraphs B, H, and R, we conclude that he has standing to challenge those paragraphs. The "judicial prediction or assumption" that Paragraphs B, H, and R "may cause others not before the court to refrain from constitutionally protected speech or expression," *Broadrick*, 413 U.S. at 612, was not disturbed by McCauley's testimony. Ideally, McCauley would have responded to questions at trial regarding injury by

---

[5] McCauley's Complaint explicitly alleges the chilling of student speech as a harm:

> The [Code] has a chilling effect on Plaintiff's and other students' right to freely and openly engage in appropriate discussions on theories, beliefs, ideas, and to debate such ideas with persons holding opposing viewpoints.

9

stating that his speech and the speech of other students was chilled by the Code. Yet his failure to provide this lawyerly response is not fatal to his claims, given that we should "freely grant[] standing to raise overbreadth claims[.]" *Amato*, 952 F.2d at 753. Paragraphs B, H, and R, all have the potential to chill protected speech. Paragraph B prohibits, *inter alia*, lewd or indecent conduct. Paragraph H prohibits conduct which causes emotional distress, including "conduct . . . which compels the victim to seek assistance in dealing with the distress." Paragraph R prohibits misbehavior at sports events, concerts, and social-cultural events, including the display of unauthorized or offensive signs. As such, under the "relaxed" rules of standing for First Amendment overbreadth claims, *Pitt News*, 215 F.3d at 363, McCauley has standing to assert facial challenges to those paragraphs.

McCauley lacks standing to challenge Paragraph C, which requires students to report witnessed violations of Major Infraction Paragraph B. Paragraph C, and its companion paragraph, Major Infraction Paragraph B, state:

> B.　　Assault/Infliction or Threat of Bodily Harm to a Person:
>
>> This includes inflicting or threatening to inflict bodily harm or coercing or restraining any person while on or about University premises. This also includes

brandishing of weapons.

C.     Aiding and Abetting or Complicity in Threatening Bodily Harm and/or Committing Bodily Harm to a Person:

This includes conspiring with or knowingly helping or encouraging another person to engage in the above mentioned behavior violations [in Major Infraction Paragraph B]. Students present during the commission of an act(s) by another which constitutes those kinds of behavior violations mentioned above [in Major Infraction Paragraph B] and who fail to report such act(s) to the proper University authorities shall be guilty of complicity to commit bodily harm to a person.

At trial, McCauley stated that he and other students were harmed by the imposition of Paragraph C's reporting requirement:

THE COURT:    Mr. McCauley, when you read paragraph C, is there something you feel you're deprived of? And if so, tell

11

us what it is.

[MCCAULEY]:     I believe that just because someone is present when a violation is being committed, but does not report that person, it basically implies that a student has to enforce the provisions of the Code of Conduct at all times, and I don't believe that's necessary.

McCauley's Complaint alleges that Paragraph C requires "students place themselves in harms-way by being compelled to act as snitches for the University[.]"

Unlike the other challenged paragraphs, which punish speech, the injury from Paragraph C identified by McCauley is grounded in having to report violations of Major Infraction Paragraph B. Paragraph C's reporting requirement does not prohibit speech so there is no risk that it "may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. Therefore, we will remand the facial challenge to Paragraph C to the District Court

12

for dismissal for lack of standing.[6]

III.

McCauley's first challenge is to the District Court's conclusion that UVI, Georges, and Ragster were not "persons" for the purposes of § 1983.[7] Although the caption of McCauley's Complaint purports to sue Georges and Ragster in their official and individual capacities, it does not allege that either individual committed any wrongful acts in their individual capacities nor did the evidence at trial reveal any such wrongful acts. Accordingly, any § 1983 claim asserted against Georges and Ragster must be based on their official actions as UVI employees and turns on whether UVI is an instrumentality of the Virgin Islands.

Territories and their officers, acting in their official

_____

[6] In so doing, we do not rule out the possibility that a plaintiff alleging a different injury could have standing to assert a facial overbreadth challenge to Paragraph C, nor do we imply anything about the constitutionality of Paragraph C.

[7] We exercise plenary review over legal questions and review factual findings for clear error. *United States v. Schiff*, 602 F.3d 152, 160 (3d Cir. 2010); *Lieberman v. Cambridge Partners, LLC*, 432 F.3d 482, 486 (3d Cir. 2005) (stating that we exercise plenary review over questions of statutory construction).

13

capacities, are not "persons" under § 1983. *Ngiraingas v. Sanchez*, 495 U.S. 182, 191-92 (1990); *Brow v. Farrelly*, 994 F.2d 1027, 1037 (3d Cir. 1993) ("[N]either the Territory of the Virgin Islands nor its officers acting in their official capacities are 'persons' under 42 U.S.C. § 1983."). To determine whether UVI was an instrumentality of the Territory of the Virgin Islands, and therefore not a "person" for purposes of § 1983, we look to the factors set forth in *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (en banc). Although the *Fitchik* factors were initially intended to determine Eleventh Amendment immunity, our Court has extended their use to § 1983. *Callahan v. City of Philadelphia*, 207 F.3d 668, 670 (3d Cir. 2000).

We analyze three factors in applying the *Fitchik* test: "(1) the source of the money that would pay the judgment (i.e., whether that source would be the state); (2) the status of the entity under state law; and (3) the degree of autonomy the entity has." *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir. 2005). The three factors should be treated as "co-equal[s]" in the analysis. *Id.* at 240.

McCauley argues that the District Court's analysis of the *Fitchik* factors was "inconclusive" and that, as a result, it should have focused on the first *Fitchik* factor, whether a judgment against UVI would have affected the Virgin Islands treasury. This argument fails. First, McCauley's assertion that the District Court's analysis of the *Fitchik* factors was

14

"inconclusive" is belied by the record. The District Court, after an exhaustive analysis of each factor, determined that two of the three factors weighed in favor of UVI being an arm of the Territory: UVI's status under Virgin Islands law and its level of autonomy. Only the funding factor weighed slightly against the conclusion that UVI was an arm of the Territory. McCauley does not challenge any of the District Court's exhaustive underlying fact-finding or legal reasoning and we decline to speculate as to what motivated his accusation that the District Court's analysis was "inconclusive." In short, we see no error in the District Court's application of the *Fitchik* factors. Second, McCauley erroneously urges us to place additional weight on the source of funding. Each *Fitchik* factor should be treated as a "co-equal." *Benn*, 426 F.3d at 240; *Cooper v. Southeastern Pa. Transp. Auth.*, 548 F.3d 296, 301-02 (3d Cir. 2008); *Bowers v. Nat'l Collegiate Athletic Ass'n.*, 475 F.3d 524, 546 (3d Cir. 2007). Thus, the District Court's conclusion that UVI was an arm of the Territory and not a "person" for purposes of § 1983, was sound.

Because UVI is an arm of the Territory, Georges and Ragster, in their official capacities at UVI, were likewise not persons under § 1983. *Ngiraingas*, 495 U.S. at 192; *Brow*, 994 F.2d at 1037. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "As such, it is no different from a suit against the State itself." *Id.* Accordingly, McCauley

15

cannot seek money damages against them. He may only seek prospective injunctive relief. *Id.* n.10; *see Brow*, 994 F.2d at 1037 n.12 (noting that we cannot rule out the possibility of "section 1983 actions for prospective injunctive relief against territorial officials in their official capacities").

IV.

Having disposed of the threshold questions of standing and whether UVI, Georges, and Ragster are "persons" for purposes of § 1983, we turn to the core of this appeal—the application of the First Amendment overbreadth doctrine to the challenged Code paragraphs.[8] We begin by outlining the basics of the overbreadth doctrine, and then turn to applying the doctrine to Paragraphs R, H, and B.

A.

The First Amendment overbreadth doctrine states that:

---

[8] We exercise plenary review over legal questions pertaining to the First Amendment. *See Schiff*, 602 F.3d at 160. "Although we generally review a district court's factual findings for clear error, [i]n the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record." *ACLU v. Mukasey*, 534 F.3d 181, 186 (3d Cir. 2008) (internal quotation marks omitted).

A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution. [A] policy can be found unconstitutionally overbroad if "there is a 'likelihood that the statute's very existence will inhibit free expression'" to a substantial extent.

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002) (footnote omitted). "[C]ourts will not strike down a regulation as overbroad unless the overbreadth is 'substantial in relation to the [regulation's] plainly legitimate sweep.'" *Id.* at 259 (quoting *Broadrick*, 413 U.S. at 615). We "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep" in an attempt to "strike a balance between competing social costs":

On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects.

*United States v. Williams*, 553 U.S. 285, 292 (2008) (emphasis in original). "[T]he overbreadth doctrine is not casually

17

employed." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). "Because of the wide-reaching effects of striking down a statute on its face . . . we have recognized that the overbreadth doctrine is strong medicine and have employed it with hesitation, and then only as a last resort." *Id.* (internal quotation marks omitted).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293. The next step is to determine "whether the statute, as we have construed it, [pen]alizes a substantial amount of protected expressive activity." *Id.* at 297. Before striking down a policy as overbroad, we must determine whether there is any "reasonable limiting construction . . . that would render the policy constitutional." *Sypniewski*, 307 F.3d at 259. "Every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (internal quotation marks omitted).

B.

Our application of the overbreadth doctrine in this case is informed by the "critical importance" free speech has in our public universities:

> [O]n public university campuses throughout this country, . . . free speech is of critical importance

18

because it is the lifeblood of academic freedom. As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'"

*DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008) (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)).[9] "It is well recognized that [t]he college classroom with its surrounding

---

[9] *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us[,] . . . [t]hat freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."); *Healy*, 408 U.S. at 180; *see Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995) (stating that the university has a "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition"); *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 671 (1973) (per curiam) (stating that "the First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech").

19

environs is peculiarly the marketplace of ideas[,] and [t]he First Amendment guarantees wide freedom in matters of adult public discourse." *Id.* at 315 (citations and internal quotation marks omitted).

Indeed, for this reason, and several others we will elaborate on, our Circuit recognizes that "there is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school." *Id.* at 315. Public university "administrators are granted *less leeway* in regulating student speech than are public elementary or high school administrators." *Id.* at 316 (emphasis in original). "Discussion by adult students in a college classroom should not be restricted," *id.* at 315, based solely on rationales propounded specifically for the restriction of speech in public elementary and high schools, *see id. Cf. Sypniewski*, 307 F.3d at 260. "Certain speech . . . which *cannot* be prohibited to adults *may* be prohibited to public elementary and high school students." *DeJohn*, 537 F.3d at 315 (emphasis in original); *cf. Healy*, 408 U.S. at 180.

We reach this conclusion in light of the differing pedagogical goals of each institution, the *in loco parentis* role of public elementary and high school administrators, the special needs of school discipline in public elementary and high schools, the maturity of the students, and, finally, the fact that many university students reside on campus and thus are subject

20

to university rules at almost all times.

First, the pedagogical missions of public universities and public elementary and high schools are undeniably different. While both seek to impart knowledge, the former encourages inquiry and challenging *a priori* assumptions whereas the latter prioritizes the inculcation of societal values. Public universities encourage teachers and students to launch new inquiries into our understanding of the world. *See Sweezy*, 354 U.S. at 250; *e.g.*, *Tilton v. Richardson*, 403 U.S. 672, 686 (1971) ("Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students.") (plurality opinion). The university atmosphere of speculation, experiment, and creation is essential to the quality of higher education. Our public universities require great latitude in expression and inquiry to flourish:

> To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and

21

> understanding; otherwise our civilization will stagnate and die.

*Sweezy*, 354 U.S. at 250. Free speech "is the lifeblood of academic freedom." *DeJohn*, 537 F.3d at 314. Public elementary and high schools, on the other hand, are tasked with inculcating a "child [with] cultural values, [to] prepar[e] him for later professional training, and [to] help[] him to adjust normally to his environment." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); *see Ambach v. Norwick*, 441 U.S. 68, 76-79 (1979). "The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). As a result, "teachers—and indeed the older students—[must] demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class." *Id.* School attendance exposes students to "role models" who are to provide "essential lessons of civil, mature conduct." *Id.* Public elementary and high school education is as much about learning how to be a good citizen as it is about multiplication tables and United States history.

Second, "public elementary and high school administrators," unlike their counterparts at public universities, "have the unique responsibility to act *in loco parentis*." *DeJohn*, 537 F.3d at 315; *e.g.*, *Fraser*, 478 U.S. at 684 (recognizing "the

22

obvious concern on the part of . . . school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech").[10]  For example, the *Sypniewski* Court noted that New Jersey law required school authorities to "hold every pupil accountable for disorderly conduct" in school.  *Sypniewski*, 307 F.3d at 259 (quoting N.J. Stat. § 18A:25-2).  A similar statute exists in every jurisdiction in our Circuit.  *E.g.*, Del. Code tit. 14, § 701; 24 Pa. Stat. § 13-1317; N.J. Stat. § 18A:25-2; V.I. Code tit. 17, § 130.  "Because of the duties and responsibilities of public elementary and [high] schools, the overbreadth doctrine warrants a more hesitant application in th[ose] setting[s] than in other contexts."  *Sypniewski*, 307 F.3d at 259.  "[B]road authority to control the conduct of [public elementary and high school] students granted to school officials permits a good deal of latitude in determining which policies will best serve educational and disciplinary goals."  *Id.* at 260; *accord Fraser*, 478 U.S. at 684-86.

Public university administrators, officials, and professors do not hold the same power over students.  The authoritarian

---

[10] We recognize that this *in loco parentis* relationship has been diluted over time.  *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (explaining that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to . . . students"); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985).

23

college education of old, described in Justice Thomas's concurrence in *Frederick v. Morse*, 551 U.S. 393 (2007), has long since been put to rest. Justice Thomas explained that in the colonial era:

> Even at the college level, strict obedience was required of students: "The English model fostered absolute institutional control of students by faculty both inside and outside the classroom. At all the early American schools, students lived and worked under a vast array of rules and restrictions. This one-sided relationship between the student and the college mirrored the situation at English schools where the emphasis on hierarchical authority stemmed from medieval Christian theology and the unique legal privileges afforded the university corporation."

*Id.* at 412 n.2 (Thomas, J., concurring) (quoting Note, *The Lingering Legacy of* In Loco Parentis: *An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1140 (1991) (footnote omitted)). The public university has evolved into a vastly different creature. Modern-day public universities are intended to function as marketplaces of ideas, where students interact with each other and with their professors in a collaborative learning environment. Indeed, students "often have values, views, and ideologies that are at war with the ones which the college has traditionally espoused or indoctrinated," *Healy*, 408 U.S. at 197 (Douglas, J., concurring). This is a far

cry from the "one-sided relationship," *Morse*, 551 U.S. at 412 n.2 (Thomas, J., concurring), that once existed.

Over thirty years ago, in *Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979), we recognized that "[w]hatever may have been its responsibility in an earlier era, the authoritarian role of today's college administrations has been notably diluted":

> Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students. By constitutional amendment, written and unwritten law, and through the evolution of new customs, rights formerly possessed by college administrations have been transferred to students. College students today are no longer minors; they are now regarded as adults in almost every phase of community life. . . . . [E]ighteen year old students are now identified with an expansive bundle of individual and social interests and possess discrete rights not held by college students from decades past. There was a time when college administrators and faculties assumed a role In loco parentis. Students were committed to their charge because the students were considered minors. A special relationship was created between college and student that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the

25

college. The campus revolutions of the late sixties and early seventies were a direct attack by the students on rigid controls by the colleges and were an all-pervasive affirmative demand for more student rights. In general, the students succeeded, peaceably and otherwise, in acquiring a new status at colleges throughout the country. These movements, taking place almost simultaneously with legislation and case law lowering the age of majority, produced fundamental changes in our society. A dramatic reapportionment of responsibilities and social interests of general security took place. Regulation by the college of student life on and off campus has become limited. Adult students now demand and receive expanded rights of privacy in their college life including, for example, liberal, if not unlimited, partial visiting hours. College administrators no longer control the broad arena of general morals. At one time, exercising their rights and duties In loco parentis, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives. Especially have they demanded and received satisfaction of their interest in self-assertion in both physical and mental activities, and have vindicated what may be called the interest in freedom of the individual will.

*Id.* at 138-40 (footnotes omitted). The idea that public

26

universities exercise strict control over students via an *in loco parentis* relationship has decayed to the point of irrelevance. *See Guest v. Hansen*, 603 F.3d 15, 21 (2d Cir. 2010) (stating that, under New York law, colleges do not act *in loco parentis*); *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003) ("[S]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students.") (emphasis omitted).

Closely related to the *in loco parentis* issue is the third observation, that public elementary and high schools must be empowered to address the "special needs of school discipline" unique to those environs. *DeJohn*, 537 F.3d at 315-16. In *T.L.O.*, the Supreme Court, in discussing the scope of a public high school student's Fourth Amendment rights, stated that teachers and administrators in public high schools have a substantial interest in "maintaining discipline in the classroom and on school grounds": "Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *T.L.O.*, 469 U.S. at 339; *e.g.*, *Hedges v. Musco*, 204 F.3d 109, 112-15 (3d Cir. 2000) (involving student accused of drug use). The Supreme Court explicitly recognized that in a high school, "a proper educational environment requires . . . the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *T.L.O.*, 469 U.S. at 339. "Compulsory

27

attendance laws automatically inhibit the liberty interest afforded public school students, as the law compels students to attend school in the first place [and] [o]nce under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 (3d Cir. 2005) (internal citations and quotation marks omitted). Unlike the strictly controlled, smaller environments of public elementary and high schools, where a student's course schedule, class times, lunch time, and curriculum are determined by school administrators, public universities operate in a manner that gives students great latitude: for example, university students routinely (and unwisely) skip class; they are often entrusted to responsibly use laptops in the classroom; they bring snacks and drinks into class; and they choose their own classes.[11] In short, public university students are given opportunities to acquit themselves as adults. Those same opportunities are not afforded to public elementary and high school students.

---

[11] It would be naive to assume that drug use and violent crime are not issues in our public universities; that is not our contention. Instead, we note that the concept of maintaining discipline in a public university classroom is markedly different from elementary and high school classrooms. In general, there is no educational component to discipline in a university setting. There is no demerit system for bad behavior or reward for good behavior in the classroom. Nor is there a "conduct" grade on a public university student's grade report at the end of each term.

28

Fourth, public elementary and high school administrators "must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988); *see, e.g.*, *Fraser*, 478 U.S. at 683 (noting concern that "[t]he speech [at issue] could well be seriously damaging to its less mature audience"); *accord Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."). Considerations of maturity are not nearly as important for university students, most of whom are already over the age of 18 and entrusted with a panoply of rights and responsibilities as legal adults. *E.g.*, U.S. Const. amend. XXVI; Restatement (Second) of Contracts §§ 12, 14 (1981) (explaining limited contractual capacity of "infants"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding that individuals may not be given the death penalty for crimes they committed while under the age of 18). "University students are . . . young adults [and] are less impressionable than younger students[.]" *Widmar v. Vincent*, 454 U.S 263, 274 n.14 (1981); *e.g.*, *Tilton*, 403 U.S. at 686 ("There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination.").

Moreover, research has confirmed the common sense

29

observation that younger members of our society, children and teens, lack the maturity found in adults. The Supreme Court has recognized, albeit while discussing juvenile offenders, that "scientific and sociological studies . . . tend to confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults." *Roper*, 543 U.S. at 569 (internal quotation marks omitted). "These qualities often result in impetuous and ill-considered actions and decisions." *Id.* (internal quotation marks omitted). "[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." *Id.* (internal quotation marks omitted). In addition, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," *id.*, and "the character of a juvenile is not as well formed as that of an adult," *id.* at 570. These conclusions were recently re-affirmed in *Graham v. Florida*, No. 08-7412, 560 U.S. __ (May 17, 2010), where the Supreme Court stated that "[n]o recent data provide reason to reconsider [its] observations in *Roper* about the nature of juveniles." *Id.*, slip. op. at 17.

Finally, university students, unlike public elementary and high school students, often reside in dormitories on campus, so they remain subject to university rules at almost all hours of the day. The concept of the "schoolhouse gate," *Tinker*, 393 U.S. at 506, and the idea that students may lose some aspects of their First Amendment right to freedom of speech while in school, *id.* at 507, does not translate well to an environment where the student is constantly within the confines of the schoolhouse.

30

"Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact." *Id.* at 513. Yet this is exactly what would occur for students residing on university campuses were we to grant public university administrators the speech-prohibiting power afforded to public elementary and high school administrators. Those students would constantly be subject to a circumscription of their free speech rights due to university rules.

The reasons we have provided are by no means exhaustive, but they are consistent with the view we espoused in *DeJohn*, 537 F.3d at 315-16, and *Sypniewski*, 307 F.3d at 260. Public universities have significantly less leeway in regulating student speech than public elementary or high schools. Admittedly, it is difficult to explain how this principle should be applied in practice and it is unlikely that any broad categorical rules will emerge from its application. At a minimum, the teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities. Any application of free speech doctrine derived from these decisions to the university setting should be scrutinized carefully, with an emphasis on the underlying reasoning of the rule to be applied.

V.

Applying the overbreadth doctrine to Paragraphs R, H,

31

and B, the first two paragraphs fail to pass constitutional muster. The last paragraph has a limited construction that would render it constitutional. Each challenged provision is discussed in turn.

## A.

McCauley challenges Paragraph R, which states:

R.    Misbehavior at Sports Events, Concerts, and Social-Cultural Events:

(1)    The throwing of any article into a crowd or onto a playing field, court, or a stage.

(2)    Alcoholic beverages of all kinds are prohibited at University sponsored events unless permitted by appropriate University officials.

(3)    Displaying in the Field House, softball field, soccer field, cafeteria and Reichhold Center for the Arts any unauthorized or obscene, offensive or obstructive sign.

32

McCauley focuses his challenge on subsection (3), which states that a student may be punished for, *inter alia*, displaying any obscene, unauthorized, or offensive sign in certain locations. The District Court reasoned that the banning of obscene messages was justified under *Fraser*, and that the banning of unauthorized or offensive signs was justified under *Hazelwood*.

While we agree with the District Court that the banning of obscene messages is not violative of the First Amendment, we do so on different grounds. The reasoning underlying the *Fraser* decision is simply inapposite. The *Fraser* Court emphasized the nature of the school and the audience—a public high school and impressionable teens. *E.g.*, *Fraser*, 478 U.S. at 683 ("The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality."). According to the Supreme Court, the high school needed to "disassociate itself [from the offending student's speech] to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685-86. This interest in inculcating fundamental values is not a priority in public universities. *See supra* Part IV.B. Indeed, the *Fraser* Court recognized as much when it noted that, in contrast to high school students, adults are permitted to engage in "highly offensive" speech in certain circumstances. *Id.* at 682 (citing *Cohen v. California*, 403 U.S. 15 (1971)).

33

The age and maturity of the listener was a primary concern of the *Fraser* Court. As support for its holding, the *Fraser* Court looked to First Amendment jurisprudence outside the context of schools that focused on the age of the listener to show that there are "limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 684 (citing *Ginsburg v. New York*, 390 U.S. 629, 637 (1968) (upholding statute banning sale of sexually oriented material to minors, even though the material was protected under the First Amendment for adults)). The Supreme Court also noted that society had "an interest in protecting minors from exposure to vulgar and offensive spoken language." *Fraser*, 478 U.S. at 684 (citing *FCC v. Pacifica Foundation*, 438 U.S. 726, 729 (1978)). The desire to protect the listener cannot be convincingly trumpeted as a basis for censoring speech for university students. Ultimately, these machinations over the applicability of *Fraser* are unnecessary. Obscenity is not protected by the First Amendment in any context. *See generally Miller v. California*, 413 U.S. 15 (1973); *Roth v. United States*, 354 U.S. 476 (1957). Thus, Paragraph R's banning of obscene speech is constitutionally sound, regardless of *Fraser*.

The District Court's reliance on *Hazelwood* to justify Paragraph R's punishment of "offensive" or "unauthorized" signs fails on both fronts. First, Paragraph R's use of "offensive" is, "on its face, sufficiently broad and subjective that

34

[it] could conceivably be applied to cover any speech . . . th[at] offends someone." *DeJohn*, 537 F.3d at 317 (internal quotation marks omitted). "Absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work [or study]—[Paragraph R] provides no shelter for core protected speech." *Id.* at 317-18. "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670; *see Tinker*, 393 U.S. at 509 (stating that "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is insufficient to justify prohibition of a particular expression of opinion); *Sypniewski*, 307 F.3d at 259 n.16 (noting that "mere offensiveness does not qualify as 'disruptive' speech"); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001). Second, the *Hazelwood* decision does not speak to the issue of authorization. Neither UVI nor McCauley discuss what procedures must be followed for a sign to be "authorized" and the University Student Handbook does not contain any procedures for authorization. Based on the record before us, Paragraph R's authorization requirement lacks any criteria for determining whether authorization should be granted and, thus, permits arbitrary, unpredictable enforcement that is violative of the First Amendment. *Cf. Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) ("[A] law subjecting the exercise of First Amendment freedoms to the

35

prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority is unconstitutional.").

Overlooking the fatal flaws of attempting to prohibit "offensive" speech and requiring authorization for signs yet providing no means for receiving authorization, and assuming that *Hazelwood* applies in the university setting, the District Court erroneously applied that precedent. While the District Court correctly noted that "*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself," *Saxe*, 240 F.3d at 213-14, and that "school 'sponsorship' of student speech is not lightly to be presumed," *id.* at 214, it then determined, despite UVI's failure to raise the issue, that the displaying of signs by students in the Field House, softball field, soccer field, cafeteria, or Reichhold Center for the Arts may reasonably be viewed as UVI's speech. It further concluded that Paragraph R was reasonably related to legitimate pedagogical concerns.

Neither of these determinations was supported by the facts or legal authority. Logic suggests that the District Court's assumption that signs displayed during sporting events, concerts, and social-cultural events at the locations listed in Paragraph R could be construed as school-sponsored speech was incorrect. The more offensive or outlandish a sign is, the less likely it is that people would attribute it to UVI. For example, in *Morse*,

36

the Supreme Court summarily dismissed the application of *Hazelwood* in a case involving a banner displaying the nonsensical phrase: "BONG HiTS 4 JESUS," *Morse*, 551 U.S. at 397. *Id.* at 405. It did so because "no one would reasonably believe that [the] banner bore the school's imprimatur." *Id.* Similar reasoning would apply to offensive signs displayed by UVI students. Indeed, the signs perhaps most likely to be prohibited, those containing socially-valueless, extremely offensive speech, would be the least likely to be seen as bearing UVI's imprimatur. *See id.* The District Court also assumed that controlling the signs displayed at the locations identified in Paragraph R served a legitimate pedagogical concern. The record does not establish this determination and an assertion, without any analysis, is simply not enough.[12]

There is no limiting, constitutional construction for Paragraph R. The lack of any procedures explaining how signs may be authorized for display is a procedural failure that is not susceptible to a constitutional construction and the ban on "offensive" signs is hopelessly ambiguous and subjective, *see DeJohn*, 537 F.3d at 317-18. Paragraph R's prohibition on "obscene" speech is unproblematic, but the deficiencies in the paragraph overwhelm the legitimacy of the ban on such speech.

---

[12] In reaching our conclusion today, we decline to consider whether the teachings of *Hazelwood* apply in the university setting or whether *Hazelwood* is limited to curricular activities.

37

Its prohibitions on "offensive" and "unauthorized" speech have no plainly legitimate sweep and may be used to arbitrarily silence protected speech. *See Sypniewski*, 307 F.3d at 259. As such, we conclude that the paragraph is facially overbroad in violation of the First Amendment.

B.

McCauley also challenges Paragraph H, which states:

H.    Conduct    Which    Causes    Emotional
      Distress:

      This includes conduct which results
      in  physical  manifestations,
      significant  restraints  on  normal
      behavior or conduct and/or which
      compels  the  victim  to  seek
      assistance  in  dealing  with  the
      distress.

The District Court concluded that because Paragraph H restricts speech that causes extreme reactions, such as "physical manifestations," it covered only speech that significantly interfered with the rights of others at UVI. As such, the District Court held that the paragraph was lawful under *Tinker*.

"Conduct" is a broad term that encompasses all "personal behavior" of a student. *Merriam-Webster's Collegiate*

38

*Dictionary* 259 (11th ed. 2003). Speech protected by the First Amendment is a type of "conduct," as it is a personal behavior, and is therefore regulated by Paragraph H. Notably, the paragraph also regulates other conduct, such as "non-expressive, physically harassing conduct [that] is entirely outside the ambit of the free speech clause." *Saxe*, 240 F.3d at 206.

Paragraph H, like Paragraph R, is entirely subjective and provides no shelter for core protected speech. *See DeJohn*, 537 F.3d at 317-18. "Emotional distress" is a very loose concept. The term "emotion" can mean anything from simply "a state of feeling," *Merriam-Webster's Collegiate Dictionary* 408, to "a conscious mental reaction (as anger or fear) subjectively experienced as strong feeling," *id.* The term "distress" similarly could connote an exceedingly minimal threshold of harm, as in "to cause to worry or be troubled," *id.* at 364, but it can also be defined as requiring more, such as "pain or suffering affecting the body, a bodily part, or the mind," *id.* Even taking a narrow understanding of "emotional distress," it is clear that the term is driven by the subjective experience of the individual. *See id.* (defining "distress").[13] The best example of the subjectivity is

_____

[13] Attempts at connecting Paragraph H to a legal definition of "emotional distress" fail. The Virgin Islands recognize intentional infliction of emotional distress, *e.g. Louis v. Caneel Bay, Inc.*, 50 V.I. 7, 20 (V.I. Super. Ct. 2008), but the "[e]xtreme and [o]utrageous conduct," *id.* (quoting Restatement (Second) of Torts § 46(1)), necessary to assert such a claim does

the last prong of the paragraph—"conduct . . . which compels the victim to seek assistance in dealing with the distress." This prong prohibits speech without any regard for whether the speech is objectively problematic. The fact that the provision only lists a few non-exclusive examples of when it may be invoked does not help its case for constitutionality. Emotional distress for purposes of Paragraph H "includes" the examples listed in the paragraph, but it also includes other scenarios that are not illustrated in the paragraph.

The scenarios in which this prong may be implicated are endless: a religious student organization inviting an atheist to attend a group prayer meeting on campus could prompt him to seek assistance in dealing with the distress of being invited to the event; minority students may feel emotional distress when other students protest against affirmative action; a pro-life

_____

not bear any clear relationship to free speech. Not all extreme and outrageous conduct involving speech is necessarily unprotected by the First Amendment. Moreover, the tort of intentional infliction of emotional distress requires intent on the part of the tortfeasor. *Id.* No such intent element is required under Paragraph H. The Virgin Islands also recognize negligent infliction of emotional distress, *e.g.*, *Fenton v. C&C Constr. & Maint., Inc.*, 48 V.I. 263, 276 (V.I. Super. Ct. 2007), but that tort requires the plaintiff have been in danger and have suffered some physical harm as a result of the emotional distress. *Id.* No similar requirements exist for Paragraph H.

40

student may feel emotional distress when a pro-choice student distributes Planned Parenthood pamphlets on campus; even simple name-calling could be punished. The reason all these scenarios are plausible applications of Paragraph H is that the paragraph is not based on the speech at all. It is based on a listener's reaction to the speech. "The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215; *see Papish*, 410 U.S. at 670; *Tinker*, 393 U.S. at 509; *Sypniewski*, 307 F.3d at 259 n.16. While "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear" it is "certainly not enough that the speech is merely offensive to some listener." *Saxe*, 240 F.3d at 217.

Also, the *Tinker* doctrine may only be invoked to address "substantial disruption[s] of or material interference with school activities[.]" *Tinker*, 393 U.S. at 514. Here, a lone individual who has a negative reaction may subject the speaker to disciplinary proceedings. That simply was not what was envisioned in *Tinker*:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in

41

class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id.* at 508-09.

Given that Paragraph H may be used to punish *any* protected speech, without forewarning, based on the subjective reaction of the listener, we conclude that its overbreadth is substantial in an absolute sense and relative to its plainly legitimate sweep. In doing so, we do not deny that there are instances where Paragraph H may be invoked and the First Amendment is not implicated: for example, where a student engages in "non-expressive, physically harassing conduct," *Saxe*, 240 F.3d at 206, that causes emotional distress, or where a student engages in obscene speech that causes emotional distress, *see generally Miller*, 413 U.S. 15; *Roth*, 354 U.S. 476. But the blanket chilling of all protected speech is still substantial in relation to these other types of conduct that may be prohibited under the paragraph. Every word spoken by a student on campus is subject to Paragraph H. Every time a student speaks,

42

she risks causing another student emotional distress and receiving punishment under Paragraph H. This is a heavy weight for students to bear. Moreover, other provisions of the Code could be invoked to punish students for non-expressive conduct or unprotected speech that causes emotional distress: for example, Major Infraction Paragraph B prohibits assault and infliction or threat of bodily harm to a person; General Infraction Paragraph A prohibits negligent bodily harm; and Major Infraction Paragraph D prohibits sexual harassment. On top of the Code, there are numerous Virgin Islands statutes that prohibit conduct that may cause emotional distress. *E.g.*, V.I. Code tit. 14, § 292 (defining assault and battery); V.I. Code tit. 14, § 1022 (defining obscene and indecent conduct). Because these other avenues for punishment exist, in striking a "balance between competing social costs," *Williams*, 553 U.S. at 292—the chilling of protected speech in a university setting, which is harmful to the core mission of the university, *see supra* Part IV.B, balanced against the harm caused by the subset of conduct that causes emotional distress and cannot be punished under other Code provisions or Virgin Islands law (if any even exist)—we conclude that the harm done to students' speech rights is substantial and requires vindication.

Paragraph H has no reasonable, limiting constitutional construction. The District Court concluded that Paragraph H includes only speech that significantly interferes with the rights of others at UVI. But construing the paragraph that narrowly would ignore the use of the word "includes" and the prohibition

43

on conduct "which compels [a] victim to seek assistance in dealing with . . . distress"—a broad, subjective prohibition for which no objective indicia are offered to explain when the provision would be violated. As such, we conclude that Paragraph H is overbroad in violation of the First Amendment.

C.

Finally, McCauley challenges Paragraph B, which states:

B.      Verbal   Assault,   Lewd,   Indecent   or
        Obscene   Conduct   or   Expressions   on
        University Owned or Controlled Property
        or at University Sponsored or Supervised
        Functions.

At trial, McCauley conceded that he had no desire to engage in the behaviors described in Paragraph B and the District Court dismissed his challenge, concluding that he had failed to establish a cognizable injury. Because McCauley need not show injury to himself to assert a facial challenge to Paragraph B, *see supra* Part II, we will evaluate his claim on the merits.

McCauley asserts that Paragraph B is overbroad because it captures speech that is protected, namely lewd, indecent, or obscene conduct. Paragraph B has a reasonable limiting construction that saves it from unconstitutionality. *See Sypniewski*, 307 F.3d at 259. "Lewd," "indecent," and

44

"obscene," could collectively be interpreted to prohibit only speech that is unprotected by the First Amendment under the *Miller* obscenity test, *see Miller*, 413 U.S. at 24-25. Thus, Paragraph B, on its face, does not violate the First Amendment.

## VI.

McCauley also asserts that the District Court erred by not deciding his as-applied challenge to Paragraph E. The District Court's conclusion that Paragraph E was unconstitutional on its face rendered adjudication of McCauley's as-applied challenge unnecessary. It appears that McCauley raised this issue in hopes of receiving the $200 he paid in fines for his violation of Paragraph E and letters of apology from UVI employees. McCauley cannot seek money damages from Ragster and Georges. *See Will*, 491 U.S. at 71. There are no allegations that the two UVI employees, in their individual capacities, harmed McCauley. *See supra* Part III. Without such allegations, there is no question that Georges and Ragster cannot be ordered to pay money damages to McCauley, so adjudication of his as-applied challenge would serve no purpose. McCauley's request that we require UVI officials to write letters of apology was not raised in the District Court and he cites no authority supporting his request. We decline to grant him that relief.

## VII.

In conclusion, UVI, Georges, and Ragster were rightly

45

deemed not to be "persons" for purposes of § 1983. On remand, McCauley's challenge to Paragraph C should be dismissed for lack of standing because any injury from that paragraph was not based on chilled speech. The District Court's dismissal of Paragraph B for lack of an injury should be reversed and judgment should be entered in favor of Georges and Ragster because that paragraph has a limited, constitutional construction. The other two paragraphs, Paragraphs H and R, are largely subjective and lack limiting constructions to save them from violating the First Amendment. Therefore, on remand, the District Court should enter judgment in favor of McCauley and against Georges and Ragster (in their official capacities) with respect to both those paragraphs. The other aspects of the District Court's judgment should remain undisturbed.