**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JONATHAN LOPEZ,
                *Plaintiff-Appellee,*

         v.

KELLY G. CANDAELE, in his
individual and official capacities
as member of the Los Angeles
Community College District Board
of Trustees; MONA FIELD, in her
individual and official capacities
as member of the Los Angeles
Community College District Board
of Trustees; GEORGIA L. MERCER,
in her individual and official
capacities as member of the Los
Angeles Community College
District Board of Trustees; NANCY
PEARLMAN, in her individual and
official capacities as member of
the Los Angeles Community
College District Board of Trustees;
ANGELA J. REDDOCK, in her
individual and official capacities
as member of the Los Angeles
Community College District Board
of Trustees; MIGUEL SANTIAGO, in
his individual and official
capacities as member of the Los
Angeles Community College
District Board of Trustees;

20143

SYLVIA SCOTT-HAYES, in her
individual and official capacities
as member of the Los Angeles
Community College District Board
of Trustees; GENE LITTLE, in his
individual and official capacities
as Director of the Los Angeles
Community College District Office
of Diversity Programs; JAMILLAH
MOORE, in her individual and
official capacities as President of
Los Angeles City College;
ALLISON JONES, in her individual
and official capacities as Dean of
Academic Affairs at Los Angeles
City College; CRISTY PASSMAN, in
her individual and official
capacities as Compliance Officer
at Los Angeles City College,
　　　　　*Defendants-Appellants,*
　　　　　　　　and

JOHN MATTESON, in his individual
and official capacities as Professor
of Speech at Los Angeles City
College,
　　　　　　　　*Defendant.*

No. 09-56238

D.C. No.
2:09-cv-00995-
GHK-FFM

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
March 3, 2010—Pasadena, California

Filed September 17, 2010
Amended December 16, 2010

Before: Ronald M. Gould, Sandra S. Ikuta and
N. Randy Smith, Circuit Judges.

Opinion by Judge Ikuta

**COUNSEL**

Mary L. Dowell and David A. Urban, Liebert Cassidy Whitmore, P.C., Los Angeles, California, for the appellants.

David J. Hacker and Heather G. Hacker, Alliance Defense Fund, Folsom, California; David A. French, Alliance Defense Fund, Columbia, Tennessee, for the appellee.

Sam Kim and Michael L. Parker, Sam Kim and Associates, P.C., Buena Park, California, for the appellee.

**ORDER**

The opinion filed September 17, 2010, is amended as follows:

At Slip Op. 14377, line 17: Before "Because Lopez fails to establish . . . " insert: <Nor does the recent Third Circuit decision in *McCauley v. University of Virgin Islands*, 618 F.3d 232, 238-39 (3rd Cir. 2010), alter this conclusion. *McCauley* held that a student disciplined for violating a provision in the student code of conduct had standing to bring a First Amend-

ment challenge not only to that provision, but also to other provisions that had not caused him any injury, on the ground that they had the potential to chill the speech of other students. *Id.* at 238. Although the Supreme Court has held that plaintiffs may raise the First Amendment rights of third parties in certain narrow circumstances (namely, where plaintiffs have suffered an injury, but not an injury to their First Amendment rights, *see, e.g., Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392 (1988)), the Court has never deviated from its rule that "[t]o bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (internal quotations omitted). *See, e.g., Munson.*, 467 U.S. at 955 (holding that even when a plaintiff has satisfied the case or controversy requirement of Article III because he "suffered both threatened and actual injury as a result of the statute," a plaintiff generally "cannot rest his claim to relief on the legal rights or interests of third parties"; however, in the First Amendment context "where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another . . . ."); *see also Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."). To the extent *McCauley* can be interpreted as holding that a plaintiff who has not demonstrated any injury in fact has standing to bring a First Amendment challenge on behalf of third parties, it is inconsistent with Supreme Court precedent, and we decline to follow it. >

No future petitions for rehearing or petitions for rehearing en banc will be entertained.

**OPINION**

IKUTA, Circuit Judge:

Today we consider a student's First Amendment challenge to a community college sexual harassment policy. First Amendment cases raise "unique standing considerations," *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003), that "tilt[ ] dramatically toward a finding of standing," *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). Despite this lowered threshold for establishing standing and the disturbing facts of this case, we conclude that the student failed to make a clear showing that his intended speech on religious topics gave rise to a specific and credible threat of adverse action from college officials under the college's sexual harassment policy. Because the student failed to carry the burden of proving he suffered an injury in fact, he does not satisfy the "irreducible constitutional minimum of standing" necessary to challenge the policy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

**I**

For the limited purpose of reviewing the preliminary injunction at issue, the salient facts are undisputed.

**A**

In the fall of 2008, plaintiff Jonathan Lopez was a student at Los Angeles City College (LACC), which is one of the public colleges within the Los Angeles Community College District (the District). At the time Lopez attended LACC, the District had promulgated a sexual harassment policy comprising a chapter of the District's "Board Rules and Administrative Regulations," as authorized under state law. *See* Cal. Educ. Code §§ 66300, 70902. LACC is subject to the District's regulations, including its sexual harassment policy. Two sections of this sexual harassment policy are relevant

here. Section 15001 sets forth the District's general policy on this issue, stating in relevant part:

> The policy of the Los Angeles Community College District is to provide an educational, employment and business environment free from unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communications constituting sexual harassment. Employees, students, or other persons acting on behalf of the District who engage in sexual harassment as defined in this policy or by state or federal law shall be subject to discipline, up to and including discharge, expulsion or termination of contract.

Section 15003(A) defines "sexual harassment" as including:

> Unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature, made by someone from or in the workplace or in the educational setting, under any of the following conditions: . . . (3) The conduct has the purpose or effect of having a negative impact upon the individual's work or academic performance, or of creating an intimidating, hostile or offensive work or educational environment.[1]

According to the policy, the District's Director of Affirmative Action Programs oversees the implementation of the sex-

---

[1] The defendants argue that this version of the sexual harassment policy is no longer applicable, as it was superseded in 2007 by a new policy that redefined the term "sexual harassment," and therefore Lopez's challenge is moot. We do not reach this argument, because we decide the case on standing grounds. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (holding that there is "no mandatory sequencing of jurisdictional issues," and we have "leeway to choose among threshold grounds for denying audience to a case on the merits" (citations and internal quotation marks omitted)).

ual harassment policy, but may delegate these duties to an individual Sexual Harassment Compliance Officer. District officials may take disciplinary action only in accordance with due process rights as well as any applicable collective bargaining agreement. For students, "disciplinary action" ranges from verbal warnings to expulsion. For employees, "disciplinary action" ranges from verbal warnings to dismissals. According to Allison Jones, LACC's Dean of Academic Affairs, neither LACC nor the District has enforced the sexual harassment policy against any teacher, student or employee. Lopez does not dispute this statement.

Sections 15001 and 15003 of the policy appear in various other official documents. For example, the quoted portion of Section 15001 appears twice in the LACC student handbook. The "Rules for Student Conduct" section of the handbook states that "[s]tudent conduct in all of the Los Angeles Community Colleges must conform to District and [LACC] rules and regulations," and that violations will result in disciplinary action. In addition, the website of the District's Office of Diversity Programs contains relevant portions of Section 15003, and gives some examples of sexual harassment, including "[v]erbal harassment," "[d]isparaging sexual remarks about your gender," "[d]isplay of sexually suggestive objects, pictures, cartoons, posters, screen savers," and "[m]aking unwelcome, unsolicited contact with sexual overtones (written, verbal, physical and/or visual contact)." The website also offers "[s]imple guidelines for avoiding sexual harassment," which include the admonition, "If [you are] unsure if certain comments or behavior are offensive do not do it, do not say it." The LACC Compliance Office's website likewise includes the relevant portions of Section 15003, and defines one form of sexual harassment as "generalized sexist statements, actions and behavior that convey insulting, intrusive or degrading attitudes/comments about women or men. Examples include insulting remarks; intrusive comments about physical appearance; offensive written material such as

graffiti, calendars, cartoons, emails; obscene gestures or sounds; sexual slurs, obscene jokes, humor about sex."

B

During the fall semester, Lopez was a student in Speech 101, taught by Professor John Matteson. For one assignment, Matteson directed his students to make an informative speech on a topic of their choosing. Lopez is a devout Christian who believes, as a tenet of his faith, that he must share his religious beliefs with others. For this assignment, Lopez chose to speak about God and the ways in which he had witnessed God act both in his life and in the lives of others. In the course of giving his speech, Lopez read a dictionary definition of marriage as being a union between a man and a woman, and read two verses from the Bible.[2] After Lopez made these statements, but while still in the middle of his speech, Matteson interrupted Lopez, called Lopez a "fascist bastard," and refused to allow Lopez to finish his speech. Matteson told the class that anyone who was offended could leave. When no one left, Matteson dismissed the class. In lieu of giving Lopez a grade, Matteson wrote on Lopez's speech evaluation form, "[a]sk God what your grade is" and "pros[elytising] is inappropriate in public school."

The day after this incident, Lopez met with Jones to complain about Matteson's actions. As Dean of Academic Affairs, Jones supervises the LACC faculty and oversees certain student matters and the policies and procedures that govern LACC. Jones told Lopez to put his complaint against Matteson in writing. When Lopez delivered his written complaint

---

[2]Though the text of Lopez's speech is not in the record, Lopez's appellate brief states that the speech quoted *Romans* 10:9 ("[t]hat if you confess with your mouth, 'Jesus is Lord,' and believe in your heart that God raised Him from the dead, you will be saved;") and *Matthew* 22:37-38 ("Jesus said to him, 'You shall love the Lord your God with all your heart, with all your soul, and with all your mind.' This is the first and greatest commandment.").

to Jones, Matteson observed this interaction. Matteson subsequently threatened Lopez, stating that he would make sure that Lopez was expelled from school.

On December 2, the day after this threat, Lopez turned in another Speech 101 assignment. Lopez's paper contained a list of proposed topics for a persuasive speech, including one on how to "exercise your freedom of speech right," which would include a discussion of how one should "[a]lways stand up for what you believe in." Matteson gave Lopez an "A" for this assignment, but wrote the following below the "free speech" proposed topic: "(Remember — you agree to Student Code of Conduct as a student at LACC)."

By this time, Lopez had obtained legal representation. On the same day that Lopez submitted his list of proposed topics, Lopez's lawyer sent Jones and Jamillah Moore, the LACC President, a letter demanding that Lopez receive a fair grade on his informative speech, that LACC discipline Matteson and require him to make a public apology to Lopez, and that LACC and its faculty provide written assurance that they would respect Lopez and other students' First Amendment rights.

Jones responded by letter two days later. The letter stated that Jones had met with Lopez twice and had asked him to put his complaints in writing and submit written corroboration of his version of the informative speech incident from other students in the class. The letter also stated that Jones had started a "progressive discipline process" with respect to Matteson, but that both collective bargaining rules and LACC's restrictions on discussing personnel matters prevented her from disclosing details about any discipline that Matteson might receive. The letter made clear that "action is being taken, but specific details may not be shared with Mr. Lopez or [his lawyer]."

The same letter also reported that Jones had received statements from two students who were "deeply offended" by

Lopez's informative speech. One student wrote that Lopez's speech "was not of the informative style that our assignment called for, but rather a preachy, persuasive speech that was completely inappropriate and deeply offensive." The student further stated that although she respected Lopez's right to free speech, "I also do not believe that our classroom is the proper platform for him to spout his hateful propaganda." The second student wrote that "I don't know what kind of actions can be taken in this situation, but I expect that this student should have to pay some price for preaching hate in the classroom." After quoting the two statements, however, the letter stated:

> [r]egardless of the other students' reactions to Mr. Lopez'[s] speech, Mr. Matteson will still be disci- plined. First amendment rights will not be violated as is evidenced by the fact that even though many of the students were offended by Mr. Lopez'[s] speech, no action will be taken against any of them for expressing their opinions.

The letter also stated that Lopez would receive a "fair grade" for both his informative speech and for the entire class.

Lopez eventually received an "A" in the class, though he alleged he never received a grade for his informative speech. In a subsequent affidavit, Jones disavowed Matteson's actions, declaring that Matteson's behavior was spontaneous and not in accordance with any LACC or District "handbooks, regulations[,] and codes." The affidavit also confirmed that "Matteson was disciplined for [his] conduct." Lopez had no subsequent interactions with Matteson, and the record con- tains no other complaints or other allegations of enforcement actions taken against Lopez due to his speech. Nor did the District or LACC take any enforcement action against Lopez under the sexual harassment policy.

C

Lopez ultimately filed suit against Matteson, Jones and other District and college officials.[3] Lopez brought four causes of action against the Defendants under 42 U.S.C. § 1983. The first three causes of action alleged that Matteson's conduct violated Lopez's First Amendment and equal protection rights. In his fourth cause of action, the only one relevant here, Lopez claimed that the District's sexual harassment policy violated the First Amendment because it was unconstitutionally overbroad and vague.[4]

Lopez moved for a preliminary injunction to enjoin the Defendants from enforcing the sexual harassment policy. In entertaining this motion, the district court first concluded that Lopez had standing to bring a facial challenge to the policy because it applied to Lopez by virtue of his enrollment at LACC, the policy likely reached the speech in which Lopez wanted to engage, and Lopez has censored himself for fear of discipline under the policy.[5] The district court then concluded that the policy was unconstitutionally overbroad and could not be narrowed, and granted Lopez's motion to enjoin the District from enforcing the policy. While this appeal of the court's preliminary injunction was pending, the district court granted the Defendants' previously filed motion to dismiss the remaining causes of action, with limited leave for Lopez to amend.

---

[3]In addition to Matteson and Jones, Lopez sued Moore, the president of LACC, Cristy Passman, the LACC Compliance Officer, Gene Little, Director of the District's Office of Diversity Programs, and the District's Board of Trustees (Kelly G. Candaele, Mona Field, Georgia L. Mercer, Nancy Pearlman, Angela J. Reddock, Miguel Santiago, and Sylvia Scott-Hayes.) Except for Matteson, who is not a named defendant in this appeal, we refer to the defendants by name or collectively as Defendants.

[4]Matteson failed to respond to Lopez's complaint, and as such the district court clerk entered default; however, the district court delayed granting a default judgment against Matteson until after this appeal is resolved.

[5]The district court therefore did not reach Lopez's as-applied challenge.

## II

We review *de novo* the district court's determination that Lopez has standing. *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 506 (9th Cir. 1992). Lopez bears the burden of establishing standing because he is the party invoking federal jurisdiction. *LSO*, 205 F.3d at 1152. We review the district court's grant of a preliminary injunction for abuse of discretion. *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009). "This review is 'limited and deferential' and it does not extend to the underlying merits of the case." *Id.* (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

### A

**[1]** In order to invoke the jurisdiction of the federal courts, a plaintiff must establish "the irreducible constitutional minimum of standing," consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury. *Lujan*, 504 U.S. at 560-61; *see Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003). The injury in fact must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted). The plaintiff must prove injury in fact "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Therefore, at the preliminary injunction stage, a plaintiff must make a "clear showing" of his injury in fact. *Winter v. Natural Resources Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008).

**[2]** Because "[c]onstitutional challenges based on the First Amendment present unique standing considerations," plaintiffs may establish an injury in fact without first suffering a

direct injury from the challenged restriction. *Bayless*, 320 F.3d at 1006. "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.*; *Getman*, 328 F.3d at 1094. In such pre-enforcement cases, the plaintiff may meet constitutional standing requirements by "demonstrat[ing] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see LSO*, 205 F.3d at 1154. To show such a "realistic danger," a plaintiff must "allege[ ] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Babbitt*, 442 U.S. at 298; *see Bayless*, 320 F.3d at 1006; *LSO*, 205 F.3d at 1154-55.

**[3]** Despite this "relaxed standing analysis" for pre-enforcement challenges, *Canatella v. California*, 304 F.3d 843, 853 n.11 (9th Cir. 2002), plaintiffs must still show an actual or imminent injury to a legally protected interest. *See Lujan*, 504 U.S. at 560. Even when plaintiffs bring an over-breadth challenge to a speech restriction, i.e., when plaintiffs challenge the constitutionality of a restriction on the ground that it may unconstitutionally chill the First Amendment rights of parties not before the court, they must still satisfy "the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction." *Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 999 (9th Cir. 2004) (quoting *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999)); *see also Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). The touchstone for determining injury in fact is whether the plaintiff has suffered an injury or threat of injury that is credible, not "imaginary or speculative." *Babbitt*, 442 U.S. at 298 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

We look at a number of factors to determine whether plaintiffs who bring suit prior to violating a statute, so-called "pre-enforcement plaintiffs," have failed to show that they face a credible threat of adverse state action sufficient to establish standing. As discussed in more detail below, in this context we have conducted three related inquiries. First, we have considered whether pre-enforcement plaintiffs have failed to show a reasonable likelihood that the government will enforce the challenged law against them. Second, we have considered whether the plaintiffs have failed to establish, with some degree of concrete detail, that they intend to violate the challenged law. We have also considered a third factor, whether the challenged law is inapplicable to the plaintiffs, either by its terms or as interpreted by the government. Such inapplicability weighs against both the plaintiffs' claims that they intend to violate the law, and also their claims that the government intends to enforce the law against them.

B

Beginning with the first factor, we have considered a government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction to be strong evidence (although not dispositive, *LSO*, 205 F.3d at 1155) that pre-enforcement plaintiffs face a credible threat of adverse state action. For example, a threat of government prosecution is credible if the government has indicted or arrested the plaintiffs, *Younger*, 401 U.S. at 41-42, if "prosecuting authorities have communicated a specific warning or threat to initiate proceedings" under the challenged speech restriction, or if there is a "history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (plaintiff established injury in fact where the government twice warned him to stop distributing handbills and threatened him with prosecution under a Georgia statute if he continued to distribute the handbills); *Culinary Workers Union v. Del Papa*, 200

F.3d 614, 616, 618 (9th Cir. 1999) (per curiam) (plaintiff had established injury in fact under a Nevada statute when the attorney general wrote a "precise and exact" letter to the union which quoted the statute in full and threatened to refer the prosecution to "local criminal authorities").

The threatened state action need not necessarily be a prosecution. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 472-73 (1987) (holding that the plaintiff established standing by proving harms flowing from the government's designation of three films as "political propaganda"); *Canatella*, 304 F.3d at 852-53 (holding that the plaintiff had standing to challenge state bar statutes and professional rules where he had previously been subject to state bar disciplinary proceedings and could be subject to them in the future). Moreover, the plaintiffs themselves need not be the direct target of government enforcement. A history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible. *See Adult Video Ass'n v. Barr*, 960 F.2d 781, 785 (9th Cir. 1992), *vacated sub nom. Reno v. Adult Video Ass'n*, 509 U.S. 917 (1993), *reinstated in relevant part*, 41 F.3d 503 (9th Cir. 1994).

**[4]** But "general threat[s] by officials to enforce those laws which they are charged to administer" do not create the necessary injury in fact. *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947); *see Rincon Band of Mission Indians v. San Diego Cnty.*, 495 F.2d 1, 4 (9th Cir. 1974) (concluding that the sheriff's statement that "all of the laws of San Diego, State, Federal and County, will be enforced within our jurisdiction" was insufficient to create a justiciable case (citing, among other cases, *Poe v. Ullman*, 367 U.S. 497, 501 (1961))). Thus, where multiple plaintiffs challenged a California law that criminalized teaching communism, the Supreme Court concluded that three of the plaintiffs, who had not alleged that "they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," but merely that they felt "inhibited" in

advocating political ideas or in teaching about communism, did not have standing. *Younger*, 401 U.S. at 42. Mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Turning to the second factor, we have concluded that pre-enforcement plaintiffs who failed to allege a concrete intent to violate the challenged law could not establish a credible threat of enforcement. Because "the Constitution requires something more than a hypothetical intent to violate the law," plaintiffs must "articulate[ ] a 'concrete plan' to violate the law in question" by giving details about their future speech such as "when, to whom, where, or under what circumstances." *Thomas*, 220 F.3d at 1139. The plaintiffs' allegations must be specific enough so that a court need not "speculate as to the kinds of political activity the [plaintiffs] desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication." *Mitchell*, 330 U.S. at 90. For example, a plaintiff challenging the licensing provisions of a state regulatory regime failed the injury in fact requirement because the plaintiff "ha[d] never indicated that it intends to pursue another license," and therefore could not "assert that it will ever again be subject to the licensing provisions." *4805 Convoy*, 183 F.3d at 1112-13; *see also, e.g.*, *Thornburgh*, 970 F.2d at 510 (organization does not have standing when the only evidence that it would be subject to a law penalizing membership in an alleged terrorist group was that its members received two publications which espoused the terrorist group's views). By contrast, plaintiffs may carry their burden of establishing injury in fact when they provide adequate details about their intended speech. *See, e.g.*, *ACLU v. Heller*, 378 F.3d 979, 984 (9th Cir. 2004) (holding that a group had standing when an individual member alleged he desired to produce and distribute flyers regarding a specific ballot initiative); *Getman*, 328 F.3d at 1093 (holding that a group had standing when the group showed,

among other things, that it had planned to spend over $1000 to defeat a specific California proposition in the November 2000 election). Without these kinds of details, a court is left with mere " 'some day' intentions," which "do not support a finding of the 'actual or imminent' injury that our cases require." *Thomas*, 220 F.3d at 1140 (quoting *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996)).

**[5]** Finally, we have indicated that plaintiffs' claims of future harm lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs. In the First Amendment context, "a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Getman*, 328 F.3d at 1095 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)). Thus, in *Leonard v. Clark*, we held that individual firemen did not have standing to challenge a portion of their union's collective bargaining agreement because the provision at issue "by its plain language applie[d] only to the Union and not to its individual members." 12 F.3d 885, 888-89 (9th Cir. 1994); *see also Getman*, 328 F.3d at 1095 (indicating that a plaintiff has not established an injury in fact where the statute "clearly fails to cover [the plaintiff's] conduct" (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003))).

Likewise, we have held that plaintiffs did not demonstrate the necessary injury in fact where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities. Thus, a group of school teachers did not have standing to challenge an Oregon textbook selection statute when both the Oregon Attorney General and the school district's lawyer "disavowed any interpretation of [the statute] that would make it applicable in any way to teachers." *Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983); *cf. LSO*, 205 F.3d at 1155 (collecting cases where the government failed to

affirmatively disavow an intent to enforce a challenged statute). Of course, the government's disavowal must be more than a mere litigation position. *See Thornburgh*, 970 F.2d at 508 (holding that aliens had standing to challenge speech restriction statutes, even though the government dropped charges based on those statutes four days before the district court hearing, because, among other things, the government could easily reinstate those charges and was bringing similar charges against other aliens).

**III**

We apply these principles to the facts of this case to determine whether Lopez has carried his burden of making a clear showing of injury in fact. *See Winter*, 129 S. Ct. at 376; *Lujan*, 504 U.S. at 560. Lopez claims he suffered such an injury because he faced a specific, credible threat of adverse state action under the District's sexual harassment policy.

A

Lopez identifies three actions on the part of LACC employees that, he claims, constitute a credible threat. According to Lopez, Matteson threatened to enforce the sexual harassment policy against him first on November 24, when Matteson interrupted Lopez's informative speech and told the class that they could leave if they were "offended," and second on December 2, when Matteson wrote on Lopez's assignment that Lopez had agreed to the "Student Code of Conduct" as a student at LACC. Third, Lopez claims that Jones's letter constituted a threat to enforce the policy because it informed Lopez that his speech had offended other students. We consider each incident in turn.

**[6]** In the November 24 incident, Matteson aggressively abused Lopez for his statements regarding marriage, prevented Lopez from speaking, asked whether other students were offended, and warned Lopez against proselytizing in

school. However, Matteson did not threaten to enforce the sexual harassment policy against Lopez or even suggest that Lopez was violating the policy. Therefore the November 24 incident, while raising serious concerns, does not help Lopez carry his burden of clearly showing he suffered an injury in fact from the sexual harassment policy. Lopez argues that because Matteson told students they could leave if they were "offended," and Section 15003(A) defines "sexual harassment" as including conduct that has the purpose or effect of creating an "offensive work or educational environment," Matteson was implicitly invoking the District's sexual harassment policy. We conclude that any link between Matteson's use of the word "offended" and the sexual harassment policy's use of the word "offensive" in this context is too attenuated and remote to rise to the level of "a threat of specific future harm" required to show an injury in fact arising from the policy. *Cf. Laird*, 408 U.S. at 14 (requiring such a threat in order to avoid advisory opinions); *Del Papa*, 200 F.3d at 616, 618 (holding that a "precise and exact" threat of prosecution was more than adequate to establish injury in fact).

[7] The December 2 incident involved a different assignment Lopez had written for Speech 101. It is plausible to read Matteson's comment on the paper, namely that Lopez had agreed to abide by the Student Code of Conduct,[6] as an implicit threat that Lopez should take care not to raise certain topics (such as those relating to marriage as being between a man and a woman, which had elicited Matteson's ire previously), and that such topics could violate the school's policies. Again, however, such an implied threat does not meet the standard necessary to show injury in fact. This assignment did not mention Lopez's religious beliefs or discuss the nature

---

[6]Although there is no document entitled "Student Code of Conduct" in the record, we assume for purposes of this analysis that the comment refers to the "Rules for Student Conduct" section of the LACC student handbook, which also contains Section 15001 of the sexual harassment policy.

of marriage, and on its face, Matteson's comment does not indicate that Lopez's speech on marriage or religion would constitute sexual harassment or otherwise violate the sexual harassment policy. Nor does Matteson's comment constitute a threat to initiate proceedings if Lopez made such remarks on marriage or religion. Rather, in the context in which this remark appeared, Matteson's comment is, at most, a "general threat" to enforce the Student Code of Conduct, rather than a "direct threat of punishment." *Mitchell*, 330 U.S. at 88. Such general threats are insufficient to establish an injury in fact.

**[8]** Finally, Lopez argues that Jones's December 4 letter is a threat to enforce the sexual harassment policy by taking action against him. Lopez points to the letter's statement that two students were offended by Lopez's speech, and one student wrote that the speech was "hateful propaganda." Read in context, however, Jones's letter does not constitute a threat of enforcement action. The letter makes clear that Matteson, not Lopez, is the target of the LACC's disciplinary actions, and states that LACC will not take action against any students, impliedly including Lopez, for exercise of their First Amendment rights. Moreover, while Jones makes the rejoinder to Lopez's attorney that two other students were offended by Lopez's speech, the students she quotes do not complain about statements of a sexual nature or suggest they regarded Lopez's speech as constituting sexual harassment; rather, they complained that Lopez's informative speech was "hateful" or "preached hate." We therefore agree with the district court's later conclusion that "the content of [Jones's] letter cannot reasonably be characterized as threatening future punishment on the basis of such [student] complaints."

**[9]** Even when we view Jones's letter and the two Speech 101 incidents collectively, they do not constitute a credible threat to discipline Lopez under the sexual harassment policy. No LACC official or student invoked or even mentioned the policy, nor did anyone suggest that Lopez's November 24 speech constituted sexual harassment. Indeed, even the

demand letter Lopez's attorney sent to LACC did not reference that policy. While Matteson and the students quoted in Jones's letter apparently were offended or angered by Lopez's November 24 speech in class, there is no indication that they, or anyone else, deemed it to be sexual harassment.

B

Other factors likewise indicate that Lopez's claims of threatened enforcement are not sufficiently concrete to meet even the minimum injury in fact threshold. As noted above, we consider both Lopez's stated intent to violate the policy and the likelihood that the District or LACC will enforce the policy against Lopez.

[10] Here Lopez has not adequately proven his intent to violate the policy because Lopez has not shown that the sexual harassment policy even arguably applies to his past or intended future speech. *See Getman*, 328 F.3d at 1095 (plaintiff must show that his "intended speech arguably falls within the statute's reach"). As we previously explained, the District's policy (per Sections 15001 and 15003(A)) precludes students from engaging in sexual harassment, which, in its most wide-reaching formulation, includes "verbal, visual, or physical conduct of a sexual nature" that has the purpose or effect of creating a "hostile or offensive work or educational environment." Lopez's November 24 speech included quotes from two Bible passages relating to salvation and the love of God, and a dictionary definition of marriage as "between a man and a woman." Lopez has given us few details about his intended future speech: he alleges only that in the future, he desires to discuss "his Christian views on politics, morality, social issues, religion, and the like," and that he wishes to "share[ ] his beliefs about Christianity with others," which means "discuss[ing] his faith and how it applies to guide his views on political, social, and cultural issues and events." Comparing Lopez's past and proposed future speech to the plain language of the District's sexual harassment policy, we

do not see, nor does Lopez explain, how the policy applies to him, given that his statements and proposed topics do not, on their face, constitute "verbal . . . conduct of a sexual nature." While the District Office of Diversity Programs and LACC Compliance Office websites suggest broader definitions of sexual harassment than contained in Section 15003(A), Lopez's speech on topics of religious concern does not, on its face, meet even those broader definitions, which focus on conduct or expression specifically related to sex (e.g., classifying as sexual harassment the "[d]isplay of sexually suggestive objects, pictures, cartoons, posters, [or] screen savers," or "[d]isparaging sexual remarks about [one's] gender"). Lopez does not argue otherwise. In short, Lopez has not shown how his past or intended speech would violate the challenged policy.

**[11]** Even if we assume (though Lopez does not argue) that Lopez intends to express religious opposition to homosexuality or same sex marriages, and even if we also assume (which again, Lopez does not argue) that college officials, teachers or students could adopt a strained construction of the sexual harassment policy that would make it applicable to religious speech opposing homosexuality or gay marriage, Lopez does not claim that anyone has done so or may do so in the future. In the absence of any argument by Lopez urging this point, we decline to give the policy such an interpretation on our own accord. Moreover, nothing in the record suggests that the District or LACC has adopted an expansive reading of the policy. Rather, Jones's uncontroverted statement that the District or LACC have never charged any teacher, student, or employee with sexual harassment under the policy points in the opposite direction. In the absence of any showing that the sexual harassment policy even arguably applies or may apply to Lopez's past or intended future speech, Lopez cannot show a concrete intent to violate the policy, and therefore cannot show a credible threat that the Defendants will enforce the policy against him.

For this reason, Lopez's reliance on *Santa Monica Food Not Bombs v. City of Santa Monica* (*Food Not Bombs*), 450 F.3d 1022 (9th Cir. 2006) and *Bayless*, 320 F.3d 1002, is misplaced. In those cases, we held that an organization can establish injury in fact sufficient for pre-enforcement standing merely by showing that it altered its expressive activities to comply with the statutes at issue and alleging its apprehension that the relevant statutes would be enforced against it. *See Food Not Bombs*, 450 F.3d at 1034; *Bayless*, 320 F.3d at 1006. Lopez argues that he is similarly situated, because he has self-censored his speech on religious topics in order to avoid violating the sexual harassment policy. However, in *Bayless* and *Food Not Bombs*, the organizations proved they had a specific, concrete intent to engage in activities that were clearly barred by the challenged law. *See Food Not Bombs*, 450 F.3d at 1034 (holding that a plaintiff that organized marches and demonstrations had standing to challenge a Santa Monica ordinance that required it to obtain a permit before engaging in marches or demonstrations); *Bayless,* 320 F.3d at 1006 (holding that a right-to-life political action committee, whose primary purpose was to present political advertising, had standing to challenge a state election statute that placed limitations on political advertising within ten days before an election). By contrast, Lopez fails to allege, let alone offer concrete details such as those supplied in *Bayless* or *Food Not Bombs*, regarding his intent to engage in conduct expressly forbidden by the sexual harassment policy; he "cannot say when, to whom, where, or under what circumstances" he will actually give a speech that would violate the sexual harassment policy. *Thomas*, 220 F.3d at 1139.

We reach the same conclusion when we inquire whether the District or LACC will likely enforce the policy against Lopez. As noted above, the inapplicability of the plain language of the sexual harassment policy to Lopez's speech, and the absence of any official interpretation of the policy as applying to Lopez's speech, cut against the existence of a credible threat of enforcement. Moreover, Jones's letter indi-

cated that LACC did not intend to take any action against Lopez. As noted above, the letter stated that Jones intended to address Lopez's complaints, discipline Matteson, and ensure that Lopez received a fair grade in the class. Further, the letter stated that although several students were offended by Lopez's speech, "First amendment rights will not be violated," and no action will be taken against any of the students, implicitly including Lopez. As Jones is the administration official with responsibility for overseeing college policies and procedures generally, her statement that no action will be taken against students for expressing their opinions is entitled to significant weight, and vitiates Lopez's claim that he faces a credible threat of enforcement. *Cf. LSO*, 205 F.3d at 1155 (concluding that "failure to disavow 'is an attitudinal factor the net effect of which would seem to impart some substance to the fears of plaintiffs' " (brackets omitted) (quoting *Thornburgh*, 970 F.2d at 508)). Nor is this a situation like *Thornburgh*, in which the government dropped charges "not because [the charges] were considered inapplicable, but for tactical reasons," 970 F.2d at 508, because here LACC had not taken any steps to enforce the sexual harassment policy against Lopez, either before or after Lopez's threat to sue the school.

Although Lopez alleges that his speech was chilled by the existence of the sexual harassment policy, self-censorship alone is insufficient to show injury. *See, e.g.*, *Laird*, 408 U.S. at 13-14 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ."); *Getman*, 328 F.3d at 1095 ("We do not mean to suggest that any plaintiff may challenge the constitutionality of a statute on First Amendment grounds by nakedly asserting that his or her speech was chilled by the statute. The self-censorship door to standing does not open for every plaintiff."). Nor does Lopez have standing merely because, as the district court concluded, he may have "more than a general interest shared with the student body at large" in challenging the policy because he is a

devout Christian. Leaving aside the question whether the sexual harassment policy has special applicability to Christians, the district court's conclusion is misguided: our inquiry into injury-in-fact does not turn on the strength of plaintiffs' concerns about a law, but rather on the credibility of the threat that the challenged law will be enforced against them. *See Babbitt*, 442 U.S. at 298-99.

**[12]** In sum, Lopez has not proposed an interpretation of the policy that would arguably apply to his intended speech and has not given any details about what he intends to say. Therefore, he has failed to prove his intent to violate the policy. Moreover, Lopez has not shown that the District or LACC has enforced the sexual harassment policy against him, interprets the sexual harassment policy as applying to his speech, or is likely to enforce the policy against him in the future. Under these circumstances, we must conclude that Lopez fails to meet the standard required of a pre-enforcement plaintiff to prove injury in fact, because he has not met the low threshold of clearly showing that he faces a specific, credible threat of adverse government action based on a violation of the sexual harassment policy.

## C

**[13]** Lopez also argues that the overbreadth doctrine allows him to assert the rights of his fellow students who are not before the court. However, Lopez properly recognized that he may only assert the rights of others "[s]o long as [he] satisfies the injury in fact requirement." Plaintiffs who have suffered no injury themselves cannot invoke federal jurisdiction by pointing to an injury incurred only by third parties. *See Munson*, 467 U.S. at 958 (noting that Munson could not assert the rights of third parties unless Munson itself had suffered an injury in fact). Nor does the recent Third Circuit decision in *McCauley v. University of Virgin Islands*, 618 F.3d 232, 238-39 (3rd Cir. 2010), alter this conclusion. *McCauley* held that a student disciplined for violating a provi-

sion in the student code of conduct had standing to bring a First Amendment challenge not only to that provision, but also to other provisions that had not caused him any injury, on the ground that they had the potential to chill the speech of other students. *Id.* at 238. Although the Supreme Court has held that plaintiffs may raise the First Amendment rights of third parties in certain narrow circumstances (namely, where plaintiffs have suffered an injury, but not an injury to their First Amendment rights, *see, e.g., Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392 (1988)), the Court has never deviated from its rule that "[t]o bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (internal quotations omitted). *See, e.g., Munson.*, 467 U.S. at 955 (holding that even when a plaintiff has satisfied the case or controversy requirement of Article III because he "suffered both threatened and actual injury as a result of the statute," a plaintiff generally "cannot rest his claim to relief on the legal rights or interests of third parties"; however, in the First Amendment context "where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another . . . ."); *see also Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."). To the extent *McCauley* can be interpreted as holding that a plaintiff who has not demonstrated any injury in fact has standing to bring a First Amendment challenge on behalf of third parties, it is inconsistent with Supreme Court precedent, and we decline to follow it. Because Lopez fails to establish the necessary injury in fact, he cannot raise the claims of third parties as part of an overbreadth challenge.

**IV**

Formal and informal enforcement of policies that regulate speech on college campuses raises issues of profound concern. As we have noted in *Rodriguez v. Maricopa County Community College District*,

> If colleges are forced to act as the hall monitors of academia, subject to constant threats of litigation both from [those] who wish to speak and listeners who wish to have them silenced, "many school districts would undoubtedly prefer to 'steer far' from any controversial [speaker] and instead substitute 'safe' ones in order to reduce the possibility of civil liability and the expensive and time-consuming burdens of a lawsuit."

605 F.3d 703, 709 (9th Cir. 2010) (brackets omitted) (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998)). Such policies, well intentioned though they may be, carry significant risks of suppressing speech. "Because some people take umbrage at a great many ideas, very soon no one would be able to say much of anything at all," *id.* at 711, an outcome that would be anathema for universities, our nation's "marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972). Rather, the First Amendment protects a speaker's "freedom to express himself on . . . issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Rodriguez*, 605 F.3d at 708-09 (quoting *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975)); *see also Cohen v. California*, 403 U.S. 15, 24-25 (1971) ("To many, the immediate consequence of this freedom [of speech] may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve.").

**[14]** Despite the serious concerns raised by policies that regulate speech on college campuses, we remain bound by the strictures of our jurisdiction, and must decline to hear cases where there is no genuine case or controversy. Under the relaxed standard applicable to First Amendment cases, Lopez's arguments come to the very edge of showing injury in fact. But Lopez has not made it over the threshold, and "[w]e will not manufacture arguments for [a party]." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). Taking the record and Lopez's arguments as we find them, we conclude that Lopez failed to make a clear showing of a specific and concrete threat that the sexual harassment policy would be enforced against him. While Lopez alleged a bruising encounter with Matteson, Lopez's suit against Matteson is not before us today, and neither Matteson nor any other Defendant ever invoked the District's sexual harassment policy against Lopez. Lopez consequently does not have standing to challenge the District's sexual harassment policy. Therefore, the order granting the preliminary injunction is **REVERSED**, the preliminary injunction is **VACATED**, and we **REMAND** for further proceedings consistent with this opinion.